[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTUAL BACKGROUND
On July 22, 1992, Melvin Jones was convicted of capital felony murder after a jury trial before the Honorable William Hadden in New Haven Superior Court. At that trial Mr. Jones represented himself. Following his conviction Judge Hadden sentenced him to a CT Page 12745 mandatory life sentence under the capital felony statute. Although Jones represented himself at the trial, he was assisted throughout the trial by two appointed standby counsel one of whom specialized in capital cases.
After less than two hours of deliberation the jury found Jones guilty of capital felony Conn. Gen. Stat. § 53a-54b(3) and carrying a pistol without a permit Conn. Gen. Stat. § 29-35.
THE STATE'S CASE AT TRIAL
During the trial the state presented evidence which showed that on October 17, 1990 at approximately 7:35 A.M. Wayne Curtis was murdered behind the steering wheel of his car while parked on Howard Avenue in New Haven. The medical examiner testified that death was from a gunshot wound to the abdomen. The bullet had entered just to the right of Curtis navel with a bullet path from the victim's right to left and downwards. The victim also had multiple severe lacerations on the left side of his head, consistent with having the car door slammed repeatedly into his head. The evidence supported the conclusion that a large quantity of blood was found on the door at the head level and that the head injuries were caused before the gunshot wound. The medical examiner further testified that the position of the wounds and the position of the victim's body were consistent with the victim curling his right leg up and turning to his left side in a defensive gesture to avoid more injury by the door.
Witness Bonaventure Console had lived for 33 years directly across the street from where the crime occurred. He regularly went to work around 6:30 to 6:45 A.M. At about that time Console saw Jones walking on Howard Avenue three or four times a week. When Console left for work on the morning of the murder he saw Curtis alive, parked on Howard Avenue near Lamberton. At the same time, Console observed Jones walking toward Curtis' car from the corner of Howard and Lamberton.
Witness Angel Delgado looked out of his window which was across the street from Curtis' car at about 7:25 A.M. on the morning of the murder. He saw the "back of the head of the person . . . like long braids, and he wore a cammy hat and cammy clothes." The man was a "black male". Delgado recognized the man from seeing him in the neighborhood "three or four times" including "a couple of days before this happened." The man was Jones, whom Delgado identified in court. Delgado was seventeen at the time of CT Page 12746 the incident and nineteen at the time of the trial. He was in high school at both times. He was nervous when he testified and had difficulty describing what he witnessed chronologically. The white male to whom Jones was talking according to Delgado's testimony was "inside the car." The talking was "an argument, yes, an argument. I didn't hear the words they were saying." After turning back into his room he heard shots, and when he looked back Jones was gone. He saw a "little girl about ten, nine zooming by the car." Delgado was sure that Jones was the man he had seen, although it surprised him that he could be so positive. Delgado stated that he had not seen Jones face clearly but recognized him because he was "the same height, braids, black male" and he "knew they were the same person."
Witness Nilda Mercado was eleven years old and did not testify at the trial because the prosecutor had promised her that she would not have to. Her psychotherapist testified that Ms. Mercado's testifying would have serious psychological consequences. Her statement to the police was admitted as a full exhibit without objection from Jones. Certain other of her statements were admitted as excited utterances. Mercado's statements showed that at approximately 7:35 A.M. while on her way to her cousin's house before school, Mercado witnessed the murder. " I saw him with his head in the car and the other man was screaming and I guess he was choking him because his hand was in the car . . . he was in the left side [of the car] choking him." Mercado's statement further read "I saw him grab him by his neck and punch him in the face like three times, and I saw him putting the white man head out of the car and the other man hitting him with the — with the door of the car, right-handed door of the car in his neck and the white man was screaming and then I saw the man carrying something in his hand like a gun, then he shot him twice, and I guess the white man died." Mercado told her aunt that the shooter was black and had "Army clothes on and braids and he had a pretty face." She further said "my aunt knew him." The aunt, Esperanza Ramos, knew only Jones who fit the description given to her by Mercado.
Witness Frankie Howard testified that she heard shots from the area of Howard and Lamberton early on the morning of the murder. A short time later, she saw Jones run from that area and discard a camouflage jacket in a dumpster. Harris retrieved the jacket hoping it contained some cocaine. She returned to her room and told her boyfriend what had happened and who had thrown the jacket. Her boyfriend, who had done some time at Somers with Jones told her "Melvin Jones was no joke, he was a killer." Two days later she CT Page 12747 turned the jacket over to the police. In the jacket was a repair ticket for work done on Curtis' car. Initially Harris had identified pictures of both Jones and another person as looking like the man who threw the jacket. Later when she heard that Jones had been arrested and was in jail, she went back to the police and made a positive oral and photo identification of him alone as the man she had seen. In the courtroom Harris positively identified Jones as the man who threw the jacket in the dumpster.
Harris was an addict in October of 1990 but had not taken any drugs on the day before she saw the defendant discard the jacket. At trial, however, it was undisputed that Harris had been drug free for eight months, was involved in a twelve step program and had left the New Haven area. Harris also admitted that she had at times provided information to police in exchange for money. It was undisputed that she had been told there would be no payment in this case for information. Finally Harris at the time of the trial was very ill with HIV.
Witness Larry Hodge also testified at the trial. Hodge's testimony was in some respects inconsistent with his pretrial statements. Those statements in both transcribed and tape recorded form were admitted as substantive evidence under State v. Whalen,200 Conn. 743, cert. denied 749 U.S. 994 (1986). Hodge testified that he had seen a car at about 3:00 or 4:00 A.M. at the Sunoco Station at Route 80 in New Haven. The victim was putting a dollar and change worth of gas in the car and Hodge offered Curtis a few dollars to give him a ride to Front Street. Hodge left the car at Front Street in front of Anastasio's Garage and began to cross the street. At that point he heard a black male yell "yo, yo" to the Curtis car. The man had a "bunch of braids" and Hodge had "seen [him] around the neighborhood." The man looked "similar" to Jones in the courtroom. Jones was a person Hodge had seen in the neighborhood. Hodge then equivocated about the strength of his identification of Jones. He admitted however, that he had told Detective Maher at the time of the photo identification that "there's no doubt in my mind that was the same guy, that was the same guy seated in the car." Hodge also claimed to be, "high as a kite," on the night of the murder, but he had never mentioned that until the day of his testimony. When questioned directly by Jones, Hodge said Jones was not the person he saw getting in the car. Hodge's earlier statement is unequivocal in its identification of Jones as the man who entered the victim's car several hours before the murder. CT Page 12748
Finally, witness Rosalie Mongillo, a neighborhood convenience store owner, testified that Jones was a regular in the neighborhood at that time. He was the only person in that area who matched the description given by Mercado and Delgado of a person from the neighborhood who had braids in his hair and wore camouflage clothing.
The foregoing evidence is a reasonable summary of the evidence presented to the jury and based upon which the jury returned the guilty verdict.
PETITION FOR NEW TRIAL
Presently before this court is the petitioner's Petition For a New Trial pursuant to Connecticut Practice Book § 904. In the petition Jones claims that one Pasquale DeMaio has "newly discovered evidence" requiring a new trial. At a deposition taken on March 30, 1994, Mr. DeMaio testified that while painting a house in the area he saw or heard part of the incident. He also testified that when questioned by the police a short time after the incident he denied seeing anything and in fact told the police that he was on another street having coffee. Faced with DeMaio's denial of any knowledge of the crime, Detective Vaughn Maher gave DeMaio his business card and told DeMaio to contact Maher if he remembered any additional information. DeMaio was not called to testify at trial by either party.
On the third day of trial, the state's attorney gave Melvin Jones a police report signed by Detective Percy Gethers which had not been produced earlier. Other police reports had been provided to the public defender on December 6, 1990 prior to the probable cause hearing. Among other things, Gether's report mentioned an interview with Pat DeMaio. DeMaio told Gethers that he was painting the house at 358-360 Howard Avenue and was there the entire time until the police arrived. Gether's report states
 "I asked him if he observed anything or what did he hear and he said nothing. I asked him if he observed anything unusual, and he said yes . . . he said, `I don't want to get involved, I just want to do my painting and get the hell out of here.' The undersigned tried every possible avenue but however to no avail."
In short, the defendant Jones was convicted in July of 1992. In December of 1990, at a time when he was represented by two CT Page 12749 appointed public defenders, he was given a copy of DeMaio's statement which in effect said that DeMaio was on a coffee break and knew nothing. On the third day of trial, he was given the statement signed by Detective Gethers which could fairly be read to lead one to the conclusion that DeMaio may have information about the incident but refused to disclose it. It is significant that the same report concerning the DeMaio interview stated that Mercado had reviewed many photographs but was not able to identify anyone as the person she observed at the scene of the crime. There is some evidence that Jones, by now pro se, was more concerned with the report's weakening of the Mercado identification than he was with the possibility of a new witness.
THE AFTER DISCOVERED WITNESS
After the trial, some time prior to July of 1993, an individual named Frank Lo Sacco contacted Mr. DeMaio after seeing his name in police reports that had been disclosed to the defense. Mr. DeMaio was then contacted several times by a woman named Emma Jones. Ms. Jones is not related to the defendant but was an enthusiastic supporter of his, both during the original trial and at this trial. At Mr. Jones' sentencing, she declared that she was in love with him.
According to DeMaio, Ms. Jones explained to him in some detail why she thought the petitioner was innocent. Her reasons included her claim that the state's witnesses were "addicts" paid by the police, that a "valuable" piece of evidence, the coat, was not able to be produced at trial. Ms. Jones then showed DeMaio pictures of the petitioner taken while he was incarcerated which DeMaio decided looked nothing like the black man involved in the shooting.
At a deposition given by Pasquale DeMaio at the law offices of John Williams on March 30, 1994 and again at the trial before this court on September 1, 1994, Pasquale DeMaio unequivocally testified that he got a good look at the murderer and that the murderer was not Melvin Jones.
There can be little doubt that on the occasion of the first interview of DeMaio by the police, DeMaio told a false story to the investigator if his current story is to be believed. There also can be little doubt that some of the specifics of DeMaio's story appear to differ from the specifics of other eye witnesses. Thus, DeMaio claims that no one was outside of the car until after the gunshots, that the struggle inside the car was mostly pushing and CT Page 12750 shoving, that the driver's side door was never opened, that the shooter was never in the street on the driver's side of the car and that no one was in the immediate vicinity of the car during the struggle and shooting.
If one were to evaluate DeMaio's testimony in the light most favorable to Melvin Jones, DeMaio initially was afraid to get involved in the matter and denied any knowledge. Subsequently, while he has been reluctant to cooperate with the police in trying to pick out the alleged perpetrator, he would claim that his conscience did not allow him to see an innocent man convicted and accordingly, he tells substantially the same story in both his deposition and at the trial before this court.
The general tenor of Mr. DeMaio's testimony at this trial can be seen from a quotation from page 46 of the transcript of September 1, 1994 in which the questioning is being done by the state's attorney.
 Question: Now, I think you testified here today that you looked at this man who got out of the car for two or three seconds and what was the distance between you and him at the time that you had this look at him for two or three seconds?
 Answer: Any where from thirty to fifty feet. Somewhere in that area.
 Question: Okay. Farther than the distance from you to the corner of the courtroom, where the young lady is sitting over there, I think you know this person?
 Answer: Maybe a little bit farther. Yes.
 Question: Okay, you had never seen that person before, am I correct?
 Answer: No, I haven't.
Question: or since?
Answer: No, I haven't.
 Question: And, today in the courtroom is the first time you have ever seen Mr. Jones, correct? CT Page 12751
 Answer: Yes, it is.
Question: According to your testimony?
Answer: Yes, it is.
 Question: So he's not a person that you knew before this incident?
 Answer: No, I did not.
 Question: And, you never saw the black male on the street side of the parked car, correct?
 Answer: Well, when he got out, yeah, I did but not beforehand, no.
Mr. DeMaio while subject to contradiction on some details was unequivocal in his testimony that Melvin Jones did not commit the murder. A portion of the transcript before this court in which the questioning is being done by Attorney Williams beginning at page 11 of the September 1 transcript fairly summarizes Mr. DeMaio's testimony.
 Question: Now, sir, I'll ask you if you would, to tell us what you saw?
 Answer: Alright. I was painting and I watched the car pull up just past the house and then I started hearing some yelling and muffled yelling and just a ruckus going on so I looked over to see what was happening and as I looked over I noticed two men struggling in a car and a little while after that I heard a couple of gunshots and then it was silent for a little while and then a man got out of the car and he, we kind of looked at each other for a few seconds and then he just walked through the alleyway.
 Question: How good a look did you get at the man?
Answer: About a good as look as I'm looking at you.
 Question: Alright. Now I'm going to ask you sir to take a look at the gentleman sitting to the left of Attorney CT Page 12752 Engstrom at counsel table here, can you tell us whether or not that's the man?
 Answer: Yeah, he's — no, that's not him.
 Question: Now, sir did there come a time when you were questioned by police officers about this matter?
 Answer: Yes, there did.
The man sitting next to Attorney Engstrom pointed out by Attorney Williams and whom the witness unequivocally denied as the murderer was the petitioner Melvin Jones.
STANDARD FOR A NEW TRIAL
Connecticut has long recognized petitions for new trials based upon newly discovered evidence. The new trial is to be granted if the petitioner can demonstrate by a preponderance of the evidence that the pre-offered evidence: (1) is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence, (2) would be material on a new trial, (3) is not merely cumulative, and (4) is likely to produce a different result at a new trial. Johnson V.[v.] State, 36 Conn. App. 59, 63 (1994).
In the instant case there is no serious claim that Mr. DeMaio's eye witness denial of Mr. Jones' guilt is merely cumulative or that it would not be material at a new trial. The burden which Jones as a plaintiff in a civil case must bear lies in his attempting to show that the evidence could not have been discovered earlier in the exercise of due diligence. If he bears that burden he must demonstrate that the evidence is likely to produce a different result in a new trial.
The court finds that under the specific facts of this case Mr. Jones exercised due diligence in gathering evidence for his defense. The public defender was provided with 21 police reports prior to the probable cause hearing. These reports contain multiple interviews with many individuals who lived in the area, possible witnesses and others who may have had relevant information concerning the victim or the preliminary suspect. It is clear that on June 12, the state's attorney disclosed four additional police reports which had not been available previously. A Gether's report (12/7/90), a Grice report (10/18/90), a Steven's report (10/20/90) and a Smith report (12/11/90). The report which disclosed the CT Page 12753 possibility that Pasquale DeMaio had knowledge, but would not cooperate, was given to Mr. Jones on July 15, 1992, the third day of trial.
The court finds that there is no failure to exercise due diligence by Mr. Jones or the public defenders failing to follow up on the first statement in which DeMaio says he had gone on a coffee break and had no information. The court is not called upon to decide what the result would be if the second DeMaio statement given to Detective Gethers had been provided to Mr. Jones or his public defenders at the time of the probable cause hearing in 1990 or even at a later date substantially before the trial. However, when that statement is made available to Jones for the first time after the commencement of the trial, the court is not prepared to find that the failure to follow up on the statement equates with a lack of due diligence in discovering evidence.
While there is no authority that a pro se defendant (even an incarcerated pro se defendant) is entitled to any special advantages at trial, the court is convinced that an examination of due diligence in the discovery of evidence must be analyzed in a reasonable manner. The court is likewise convinced that what might be required for due diligence in following up a police report provided well in advance of trial may not be required when that report is produced for the first time in the middle of the trial. Relying heavily on the late disclosure of the second DeMaio statement, the court finds that Mr. Jones could not have discovered the newly discovered evidence earlier in the exercise of due diligence.
Finally, Mr. Jones must demonstrate by a preponderance of the evidence that the new evidence is likely to produce a different result in a new trial. Asherman v. State, 202 Conn. 434 (1987). Courts should be guided by the general principle that a new trial should be granted because of newly discovered evidence only if an injustice was done or it is probable that on a new trial a different result would be reached. Summerville v. Warden,229 Conn. 397 (1994).
Connecticut cases have employed the Asherman standard in several different context involving newly discovered evidence.Lombardo v. State, 172 Conn. 385 (1977) (new testimony of two witnesses one of whom did not testify at trial and one of whom invoked the Fifth Amendment at trial); Taborsky v. State, 142 Conn. 624-625 (1955) (new evidence of mental disease); Krooner v. State, CT Page 12754137 Conn. 58 (1950) (evidence by friends, doctors and fellow shipmates the defendant was drunk or mentally ill at the time of the murder); Bellink v. State, 114 Conn. 102 (1932) (newly discovered witness).
The court recognizes that at the criminal trial of this matter the burden would be on the state to prove beyond a reasonable doubt that Jones was guilty of the crimes charged. The court further acknowledges that in this civil petition for a new trial the burden is on Jones to prove by a preponderance of the evidence the elements necessary for a new trial and in particular to prove that DeMaio's testimony is likely to produce a different result at that new trial.
This court recognizes that in many ways Mr. DeMaio is somewhat like the witness Wallace in Johnson v. State, 36 Conn. App. 59
(1994). The difference being that Wallace testified at the Johnson trial while DeMaio, because of the story he told the police, was not called by either party in the Jones trial. Courts are understandably very careful in granting new trials based upon recanting witnesses. The trial court in Johnson characterized Wallace's testimony as having been influenced by meeting with the petitioner's mother and the sympathy associated with realizing that his identification resulted in a man going to prison. Johnson at page 71. A substantial part of the state' s argument in the instant case is that DeMaio's testimony was influenced by Lo Sacco and Ms. Jones.
However, unlike the recanting witness Wallace, DeMaio has never recanted or changed his story with regard to identification. On the occasions that DeMaio has made any identification, he has been insistent that while he cannot or will not identify the perpetrator, he got a good look at the perpetrator and the perpetrator was not Melvin Jones.
The Appellate Court has recently held:
 "In determining the potential impact of new evidence, the trial court must weigh that evidence in conjunction with the evidence presented at the original trial. Fisher v. State, 33 Conn. App. 122, 124 (1993).
Cognizant of this requirement, this court has reviewed in considerable detail the evidence presented at the first trial. CT Page 12755 This court has also had the opportunity to observe Mr. DeMaio and to exercise its discretion in determining whether the petitioner has established substantial grounds for a new trial.
After listening to Mr. DeMaio, this court is convinced that Mr. DeMaio honestly believes that the perpetrator of the murder was not Melvin Jones. While Mr. DeMaio may have been less than candid in his cooperation with the police, perhaps because of fears of involvement in a drug related crime as perceived by him, the court does not believe that DeMaio is lying when he says Jones did not commit the crime. Further, the court does not believe that DeMaio is lying when he says he witnessed the crime and got a good look at the perpetrator. The court is somewhat more concerned whether Mr. Lo Sacco and Ms. Jones may have intentionally or unintentionally planted doubt in Mr. DeMaio's mind. Nevertheless Mr. DeMaio is not a recanting witness, but a witness who was never heard at the trial. Given this fact the court finds that Melvin Jones has shown by a preponderance of the evidence that if the case is retried a different result is likely at the new trial.
For the foregoing reasons, the court orders a new trial in the matter of State v. Melvin Jones. Nothing in this opinion should be interpreted as indicating any intention on the part of the court that Mr. Jones be released from confinement unless (1) all charges against him are dismissed or (2) he post bond if such bond is set by an appropriate court or (3) he is acquitted following a new trial.
The court by,
Kevin E. Booth, Judge