## KEITH JOHNSON *v.* STATE OF CONNECTICUT
## (12591)

O'CONNELL, FREEDMAN and SPEAR, Js.

Argued June 10—decision released September 13, 1994

*Christopher Drew,* law student intern, with whom were *Brian J. Kornbrath,* and, on the brief, *Donald Mahoney,* law student intern, for the appellant (petitioner).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *James Thomas,* state's attorney, and *Edward Narus,* assistant state's attorney, for the appellee (respondent).

O'CONNELL, J. Pursuant to General Statutes § 52-270,[1] the petitioner brought this petition for a new trial on the ground of newly discovered evidence. Following an adverse ruling, the petitioner appealed to this

---

[1] General Statutes § 52-270 (a) provides in relevant part: "The superior court may grant a new trial of any action that may come before it, for . . . the discovery of new evidence . . . ."

court claiming that the trial court was obligated to order a new trial because the victim recanted his identification testimony. Related to this claim is the petitioner's argument concerning the applicable standard for granting a petition for a new trial. In the alternative, the petitioner argues that the trial court abused its discretion by deciding that the victim's recantation would not likely produce a different result in a new trial. We affirm the judgment of the trial court.

The record discloses that on September 25, 1990, a jury found the petitioner guilty of robbery in the first degree in violation of General Statutes § 53a-134, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 and assault in the second degree in violation of General Statutes § 53a-60. The petitioner was tried jointly with two other defendants who the state claimed were coparticipants in the crimes. The other defendants are not involved in this petition.

On October 12, 1989, at approximately 6:45 p.m., Timothy Wallace was assaulted and robbed by three men, two of whom were armed. The assailants took his Whalers[2] jacket, his watch and some cash. Wallace reported the robbery immediately and gave the police descriptions of the assailants. At approximately 8 p.m. that same evening, on the strength of the descriptions, the police arrested the three men who would later be convicted of the crimes, one of whom was wearing a Whalers jacket.

The next day, Wallace returned to the police station to look at arrays of photographs. He was shown three eight picture arrays, each array containing a photo of one of the suspects arrested the night before. Wallace

[2] "The Whalers are a professional hockey team from Hartford." *State v. Harris,* 28 Conn. App. 474, 476 n.1, 612 A.2d 123, cert. denied, 223 Conn. 926, 614 A.2d 828 (1992).

picked the suspects' pictures out of the arrays and identified them as being of the men who had attacked and robbed him.

Almost one year later, in September, 1990, Wallace testified at trial that he was positive of the photographic identification and that he had no doubt that these men were his assailants. There was some discrepancy in his description of the petitioner's height and weight, but his description of the petitioner's coloring, hair length and clothing was consistent throughout the proceedings.[3]

At his criminal trial the petitioner called five alibi witnesses: his mother, his sister, his brother, his sister-in-law, and a friend of his mother's. They all testified that until approximately 7:30 p.m. on the night of the robbery the petitioner was with them, at the house he shared with his mother. At that time, according to this testimony, his brother and sister-in-law gave the petitioner a ride to the corner of Capen and Clark Streets, about ten blocks from the scene of the robbery. The petitioner was on his way from there to visit a friend on Elmer Street when he met Reginald Harris and Dwayne Saunders, the two men later convicted, along with the petitioner, of the robbery. The three men talked briefly and had begun walking together up the street when they were surrounded by police and arrested.

---

[3] Immediately after the robbery, Wallace described the robber later identified as the petitioner as five feet eight inches and 180 pounds. The next day, Wallace described him as five feet six inches with a medium build. At trial, Wallace said he remembered the man being five feet ten inches. The petitioner never stood up at trial. The petitioner's mother testified at trial that the petitioner was six feet and 225 pounds at the time of the robbery. At one point Wallace testified that he himself was six feet or six feet one inch. At the hearing on the petition for a new trial, Wallace and the petitioner stood together, and the court noted that the petitioner was one and one-half inches to three inches shorter than Wallace.

On September 27, 1990, a day after the jury returned a guilty verdict and almost one year after the robbery, the petitioner's mother saw Wallace at a neighborhood pharmacy about one block from the crime scene.[4] She identified herself and told him about the guilty verdict. She then asked Wallace if he was sure that her son was one of Wallace's assailants. Wallace replied that he was not sure.

Wallace did not communicate his doubt to the petitioner's attorney. Upon learning of Wallace's doubt from the petitioner's mother, the petitioner's attorney sent an investigator to take Wallace's statement. On September 27, 1990, Wallace told the petitioner's investigator that "[w]hen I saw [the petitioner] in court I noticed he was taller [and] heavier, and was wearing glasses. . . . I did testify that day that [the petitioner] was involved in the robbery, however, I now think I may have made a mistake in identifying him."

The next proceeding was a hearing on a motion for a new trial, held on October 12, 1990, at which time Wallace testified that he was about 40 percent sure of his identification; he could not say whether it was or was not the petitioner.[5] The hearing on the petition for a new trial was held in December, 1992. At that hearing, Wallace testified that he was sure that the petitioner had not been one of his assailants. The petitioner's mother, who had seen Wallace in the pharmacy numerous times since their initial meeting, testified that she neither threatened Wallace nor made

[4] The petitioner and his mother live four or five blocks from where the crime took place. Wallace lived three or four blocks from the crime scene at the time of the robbery. He has since moved to New York City, but his family remains in the neighborhood.

[5] The trial court did not rule on the *motion* for a new trial because it was based on a claim of newly discovered evidence and thus could be the subject only of a *petition* for a new trial brought in accordance with General Statutes § 52-570 and Practice Book § 904.

him any promises in exchange for his recantation. The trial court denied the petitioner a new trial.

We first address the threshold issue of whether the trial court applied the proper standard in denying the petition for a new trial. Citing *Pradlik* v. *State,* 131 Conn. 682, 687, 41 A.2d 906 (1945), and *Asherman* v. *State,* 202 Conn. 429, 434, 521 A.2d 578 (1987), the petitioner argues that there is a split of authority in Connecticut regarding the proper standard governing the granting of a petition for a new trial based on newly discovered evidence. We do not agree.

Connecticut has long recognized petitions for new trials based on newly discovered evidence. *Lester* v. *State,* 11 Conn. 415, 418 (1836); *Gallup* v. *Fish,* 2 Root (Conn.) 452 (1796); *Ainsworth* v. *Sessions,* 1 Root (Conn.) 175 (1790); *Foster* v. *Hough,* 1 Root (Conn.) 173 (1790). The modern standard, or an equivalent formulation, adopted by a majority of state and federal courts for granting such a petition[6] is based on the landmark case of *Berry* v. *State,* 10 Ga. 511 (1851). Connecticut adopted this general standard as early as 1880 in *Hamlin* v. *State,* 48 Conn. 92, 93 (1880), and has since applied it in a long line of cases. *Asherman* v. *State,* supra, 202 Conn. 434; *Kubeck* v. *Foremost Foods Co.,* 190 Conn. 667, 670, 461 A.2d 1380 (1983); *Burr* v. *Lichtenheim,* 190 Conn. 351, 355, 460 A.2d 1290 (1983); *Pass* v. *Pass,* 152 Conn. 508, 511, 208 A.2d 753 (1965). Under this standard, a new trial is granted if the petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence (1) is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence, (2) would be material on a new trial, (3) is not merely cumulative, and (4) is likely to produce a different result in a new trial. *Asherman* v. *State,* supra, 434. In analyzing the forego-

---

[6] See 58 Am. Jur. 2d, New Trial § 415 (1989).

ing factors, trial courts are guided by the general principle that a new trial should be granted because of newly discovered evidence only if an injustice was done or it is probable that on a new trial a different result would be reached. *Summerville* v. *Warden,* 229 Conn. 397, 425–26, 641 A.2d 1356 (1994); *Taborsky* v. *State,* 142 Conn. 619, 623, 116 A.2d 433 (1955). The scope of review of a trial court's decision to grant a new trial on the basis of newly discovered evidence is limited to whether the trial court abused its discretion. *Summerville* v. *Warden,* supra, 426.

Connecticut cases have employed this standard, which we will refer to as the *Asherman* standard, in several different contexts involving newly discovered evidence. *Lombardo* v. *State,* 172 Conn. 385, 389, 374 A.2d 1065 (1977) (new testimony of two witnesses, one of whom did not testify at trial and one of whom invoked fifth amendment at trial); *Taborsky* v. *State,* supra, 142 Conn. 624–25 (new evidence of mental disease); *Krooner* v. *State,* 137 Conn. 58, 66, 75 A.2d 51 (1950) (evidence by friends, doctors and fellow shipmates that defendant was drunk or mentally ill at time of murders); *Link* v. *State,* 114 Conn. 102, 157 A. 867 (1932) (newly discovered witness). The petitioner does not cite, nor does our research reveal, any Connecticut case employing the *Asherman* standard in a petition for a new trial based solely on a claim of false testimony, i.e., recantation.[7]

A standard specifically addressing the issue of false testimony was enunciated in *Larrison* v. *United States,* 24 F.2d 82 (7th Cir. 1928). False testimony may be of two types: (1) where a material witness admits to per-

---

[7] One case employing the *Asherman* standard, *State* v. *Edwards,* 10 Conn. App. 503, 524 A.2d 648, cert. denied, 204 Conn. 808, 528 A.2d 1155 (1987), involved a claim made by the defendant's sister that the complainant's son had recanted his testimony. The son denied such a recantation. We, however, do not consider such disputed testimony a recantation.

juring himself at trial[8] or, as in the present case, (2) where a material witness has recanted his testimony and claims he was mistaken as to what he said at trial. See generally 3 C. Wright, Federal Practice and Procedure (1982) § 557.1. In analyzing a petitioner's claim under these circumstances, a new trial should be granted when (1) the court is reasonably well satisfied that the testimony of a material witness is false, (2) without it the jury might[9] have reached a different conclusion, and (3) the party seeking a new trial was taken by surprise when the false testimony was given. *Larrison* v. *United States,* supra, 87. Connecticut adopted this standard as applicable to recantations in *Pradlik* v. *State,* supra, 131 Conn. 687; see also *Smith* v. *State,* 141 Conn. 202, 104 A.2d 761 (1954); *Smith* v. *State,* 139 Conn. 249, 251, 93 A.2d 296 (1952); *State* v. *Davis,* 2 Conn. Cir. Ct. 257, 262, 197 A.2d 668 (1963). Appellate review of a trial court's decision in this regard is likewise conducted under an abuse of discretion standard. *Pradlik* v. *State,* supra, 687.

Under the first prong of the *Pradlik* standard, a petition for a new trial based on a recantation should be granted only if the judge is convinced that the original testimony at trial was false. This, of course, requires the judge to examine the circumstances surrounding

---

[8] We note, however, that a conviction obtained by the prosecution's "*knowing*" use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Emphasis added.) *United States* v. *Agurs,* 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

[9] There has been some dispute as to the applicable standard of proof under this standard, i.e., whether a new jury "might," or "would probably," have reached a different result. See *United States* v. *Stofsky,* 527 F.2d 237, 245 (2d Cir. 1975). The petitioner neither raises the question nor seeks to apply the former standard, which has been considered by some to be more "lenient." Id.; see generally comment, "Rethinking the Standard for New Trial Motions Based Upon Recantations as Newly Discovered Evidence," 144 U. Pa. L. Rev. 1433 (1986). Because our disposition of this appeal does not require us to resolve this issue, we do not address it.

the recantation in order to determine whether it is credible. For example, in *Smith* v. *State,* supra, 139 Conn. 249, the Supreme Court affirmed the trial court's denial of a petition for a new trial based on a witness' recantation. A portion of the evidence adduced at the criminal trial centered on three witnesses who claimed that the petitioner drove a car similar to that used during the murder several days earlier. Id. One of those witnesses recanted her testimony at a deposition in Alabama while serving a prison sentence. Employing the *Pradlik* standard, the trial court found that the recantation was not credible and denied the petition. The Supreme Court affirmed the trial court's decision under an abuse of discretion standard. Id., 253.

Similarly, in *State* v. *Davis,* supra, 2 Conn. Cir. Ct. 257, the Appellate Division of the Circuit Court applied the *Pradlik* standard to a witness' recantation, stating that it was the trial court's function to compare the character, weight and credibility of the witness' recantation to that of the witness' testimony at trial in order to determine whether a new trial was warranted. Id., 262.

A recent application of the credibility assessment under the *Pradlik* standard can be found in this court's decision in *Talton* v. *Warden,* 33 Conn. App. 171, 179, 634 A.2d 912, cert. granted on other grounds, 228 Conn. 919, 636 A.2d 850 (1994), a case, like the present one, involving a victim's recantation.[10] This court concluded that the trial court must make a credibility determination of the recantation, i.e., it must be "reasonably well satisfied that the testimony given by a material witness [at the original trial] is false."[11] Id., 177.

---

[10] We note that the recantation testimony in *Talton* was in the context of a habeas corpus proceeding and not a petition for a new trial.

[11] The Supreme Court granted certification in *Talton* v. *Warden,* 228 Conn. 919, 636 A.2d 850 (1994). The first two questions certified demonstrate that the determination of credibility was a proper consideration for

Accordingly, this court affirmed the habeas court's findings that the victim's testimony was not credible because it was based, inter alia, on feelings of remorse stemming from the victim's knowledge of the lengthy sentence imposed as a result of the petitioner's conviction.

Despite the petitioner's assertion to the contrary, our research reveals no split in authority in Connecticut concerning the applicable standard for a petition for a new trial. Rather, there are two standards applicable to petitions for new trials based on newly discovered evidence—one for false testimony and one for all other evidence. In this case, the trial court assumed, without deciding, that the victim's recantation constituted newly discovered evidence and thereafter limited its analysis to the fourth prong of the *Asherman* standard, namely, whether the recantation would likely produce a different result at trial. In doing so, the trial court assessed the credibility of the recantation and thereafter denied the petition.

The petitioner argues that the trial court properly applied the *Asherman* standard but in doing so, improperly assessed the credibility of the recanted testimony. He contends that the trial court was limited under the *Asherman* standard to an assessment of the impact the recantation testimony would have on a jury on retrial. Despite the legion of cases holding that a petition for new trial is addressed to the sound discretion of the trial court; *Gillis* v. *Gillis*, 214 Conn. 336, 340, 572 A.2d 323 (1990); *Bernier* v. *National Fence Co.*, 176 Conn.

the trial court and did not have to be reserved for the jury at retrial. The first two certified questions are: (1) "Did the Appellate Court correctly conclude that, based on the record of the habeas proceeding, the habeas court properly determined that the recantation testimony of the victim-witness was not credible?" and (2) "If the recantation testimony of the victim-witness was credible, did the Appellate Court properly decline to find that the appellant's due process rights were violated?" Id. The third certified question is not relevant to our discussion.

622, 628, 410 A.2d 1007 (1979); *E.M. Loew's Enterprises, Inc.* v. *Surabian,* 146 Conn. 608, 610, 153 A.2d 463 (1959); the petitioner asks us to establish a rule of law that, when a defendant has been convicted solely on the basis of a witness who later recants, a petition for a new trial must automatically be granted under *Asherman.* Although the petitioner fails to cite any Connecticut cases holding that the trial court should be deprived of the time honored jurisdiction over the witnesses' credibility in a petition for a new trial, the petitioner apparently feels that under the present circumstances a hearing serves no purpose and that the petitioner should have a new trial on demand.

In the alternative, the petitioner argues that should the *Pradlik* standard apply, the trial court failed under that test to make a proper credibility determination. We agree with that portion of the petitioner's alternative argument that the trial court should have applied the *Pradlik* standard to the victim's recanted testimony. We conclude, however, that the trial court properly applied that standard, albeit mistakenly, in its analysis of the fourth prong of the *Asherman* standard. In essence, the trial court's analysis under the fourth prong of the *Asherman* standard encompassed the credibility determination mandated by the first prong under *Pradlik.*[12] Accordingly, we now move to

---

[12] We need not address the issue of exactly what kind of credibility assessment may be proper under the fourth prong of the *Asherman* standard. We note that a credibility type analysis has been applied under *Asherman* in certain factual circumstances; *Lombardo* v. *State,* supra, 172 Conn. 391 (under *Asherman,* trial court not persuaded that new witness' exculpatory testimony credible enough to persuade jury). Such analysis is consistent with the principle that a petition for a new trial is addressed to the sound discretion of the trial court. *Ridolfi* v. *Ridolfi,* 178 Conn. 377, 379, 423 A.2d 85 (1979).

Notwithstanding, the petitioner cites to a myriad of cases from other jurisdictions for the proposition that a trial court is limited under the *Asherman* standard, or its equivalent formulation, to an assessment of the impact the new evidence will have at a new trial. One such case, however, *State*

an analysis of whether the trial court properly denied the petition for a new trial on the basis of its credibility assessment of the victim's recantation.

Recantation as grounds for a new trial has always been viewed with skepticism. Well over one hundred years ago, our Supreme Court enunciated this skepticism in *Shields* v. *State,* 45 Conn. 266, 270 (1877) as follows: "After the trial is over and the accused stands convicted, with the heavy penalty of the law impending and just ready to fall upon him, how easy by artful or even honest suggestion to awaken a sympathy even in the heart of the victim, who was the main, perhaps only witness against the accused, and who naturally feels responsible for the conviction; and how easy for such witness by a process of speculation, colored by feeling, to feel and express a doubt about the correctness of the opinion entertained at the time of the transaction." See also *Ainsworth* v. *Sessions,* supra, 1 Root (Conn.) 176; 58 Am. Jur. 2d, New Trial § 440 (1989).

The trial court in this case described the victim's recantation as "something akin to buyer's remorse," a characterization on which the petitioner's argument that the trial court abused its discretion principally relies. The term "buyer's remorse" is merely shorthand for the situation described in *Shields* v. *State,* supra, 45 Conn. 270, to wit, after the fact self-doubt brought on by the realization that one's testimony has put another behind bars. The terms "buyer's remorse" serves to distinguish this sort of recantation from that where the recanter admits to knowingly perjuring himself at trial and now allegedly wants to "come clean."

v. *Prudholm,* 446 So. 2d 729, 737 (La. 1984), appears explicitly to endorse a credibility type analysis. In affirming the trial judge's denial of the defendant's petition for a new trial, the Louisiana Supreme Court stated that "[w]e agree with the trial judge that [the witness] would not have been a credible witness and that the repudiation of his testimony would not have been persuasive before a new jury." Id.

In this case, Wallace's recantation is of the former type. He never claimed that he lied when he identified the petitioner in the photo array. On the contrary, he was absolutely sure of his identification. Later, he says that he began having doubts at trial and stated at the hearing on the petition for a new trial that he could not identify the petitioner as the person who robbed him. The trial court noted this by stating "[w]hat began as an unexpressed doubt [at trial], graduated to the possibility of a mistake [upon seeing the petitioner's mother after trial and] became a certainty of error in identification [at the hearing for a new trial]."

The seeds of doubt in Wallace's mind were apparently not planted until almost one year after the robbery when, after having just finished testifying at the petitioner's trial, he met the petitioner's mother in the local pharmacy. During their conversation, the petitioner's mother told Wallace who she was, said that her son was found guilty, and asked if he was sure it was her son who robbed him. It was only then that Wallace expressed doubt about his prior identification, telling the petitioner's mother that when he saw the petitioner at trial he looked bigger than he remembered and that he also was wearing glasses at the time of the robbery. Although Wallace testified at trial that the petitioner looked bigger than before, he did not communicate any doubt regarding his prior identification or his in-court identification of the petitioner during the trial. By the time of the hearing on the petition for a new trial, however, Wallace testified that he now had no doubt that the petitioner was not involved in the robbery. This is a classic case of a *Shields* situation, an erosion of the victim's confidence in his own memory.

The petitioner complains that the trial court made a credibility determination without delineating any objective reasons for not believing the recantation. We

do not agree. In a memorandum of decision, the trial court found, inter alia, that (1) the victim's recantation came about only after a conversation between the petitioner's mother and the victim, (2) the victim conceded that his memory had diminished over time and was better at the time of his initial identification of the petitioner than at the time of the hearing on the petition for a new trial, and (3) the victim never recanted his identification of the petitioner's photograph. We note, as the trial court did, that his recantation was limited to the petitioner's height and weight and not his facial features. Significantly, the petitioner had gained a considerable amount of weight since the time of his arrest—from 238 pounds at the time of the crime to 283 pounds at the hearing on this petition. At his criminal trial, the petitioner had gained only five to ten pounds from the date of the crime. Moreover, the trial court found that Wallace had demonstrated under questioning during trial a difficulty in gauging the height of people present in the courtroom, casting doubt on whether his present uncertainty over the height and weight of the petitioner was believable.

The trial court also characterized Wallace's testimony as having been influenced by the meeting with the petitioner's mother and the sympathy associated with realizing that his identification resulted in a man's going to prison. Finally, the trial court was aware of the petitioner's extensive record[13] and that he had not testified at his criminal trial because his attorney advised him that the jury would likely be swayed by his criminal record. Despite the petitioner's argument to the contrary, we are satisfied that the trial court properly

---

[13] The petitioner admitted the following convictions: conspiracy to commit first degree robbery in 1987, third degree robbery in 1988, possession of narcotics in 1988, second degree larceny of a motor vehicle in 1989, the 1990 conviction that is the subject of this petition and a subsequent conspiracy to commit first degree robbery also in 1990.

set forth the factors supporting its analysis of the credibility of Wallace and his recantation and in holding that Wallace's testimony at trial was not false.

Despite the foregoing analysis provided by the trial court regarding the credibility of the recantation, we note that nowhere in the memorandum of decision did the trial court explicitly state that it did not believe Wallace. Even if we assume for the sake of argument that the trial court did not adequately set forth the reasons it found the recantation incredible, the petitioner did not file a motion for articulation asking the trial court to enunciate the reasons why the court felt the recantation unworthy of belief. The petitioner argues that such a motion would have been pointless because all of the facts were in the record. We point out that Practice Book § 4059[14] requires the trial court to set forth not only the factual basis of its decision but also its conclusions as to each claim of law raised by the parties.

If the petitioner complains that the trial court did not include in its memorandum of decision the reasons why it did not find the recantation credible, his first recourse was to ask the trial court, by way of a motion for articulation, why it so concluded. There may have been objective reasons, in addition to the ones cited, that the trial court could have furnished that would have assisted the petitioner in his obligation to furnish a proper record on appeal.

On the other hand, the trial court's reasons for disbelieving the recanter may have been based, in part, on those myriad of tiny signals, such as tone of voice,

---

[14] Practice Book § 4059 provides in relevant part: "[W]hen rendering judgments in trials to the court . . . the court shall, either orally or in writing, state its decision on the issues in the case and, if there are factual issues, the factual basis of its decision. The court shall include in its decision its conclusion as to each claim of law raised by the parties. . . ."

manner of breathing, gesticulations, nervousness and the like that traditionally are used by triers of fact in assessing a witness' credibility. A motion for articulation would not have helped the petitioner in this aspect nor are we prepared to require a trial judge to attempt to articulate such reaction to a witness.

The judgment is affirmed.

In this opinion the other judges concurred.