[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition for a new trial, filed by the plaintiff on October 21, 1991 in the Hartford Judicial District. In the original petition, the plaintiff sought a new trial on the basis of four grounds; a claim that the victim of the underlying crime had now admitted that her identity of the plaintiff as a perpetrator was mistaken; a prejudicial photo array conducted by the Hartford Police Department; ineffective assistance of counsel; and, the State's failure to adhere to a plea agreement with the plaintiff.
Subsequent to the filing of his Petition for a New Trial, the plaintiff filed a petition for a writ of habeas Corpus in the Tolland Judicial District bearing Docket Number CV 91 1362 S. In the habeas petition, Channer alleged that he had been denied the effective assistance of trial and appellate counsel in the underlying criminal proceedings. The habeas corpus matter was heard and decided by this court. By Memorandum dated February 8, 1996, this court dismissed the petition.
This petition for a new trial was transferred to the Tolland Judicial District by order dated August 2, 1996 because the plaintiff's petition for a writ of habeas corpus based on the same conviction had been filed and heard in Tolland. This petition for a new trial retains its Hartford Judicial District docket number, and the file is herewith transferred back to the Hartford Judicial District upon the filing of this Memorandum of Decision.
Based on the evidence adduced at the hearing on the petition for a new trial, the court finds the following facts and enters CT Page 9009 the following order.
On November 29, 1990, the plaintiff was found guilty following a jury trial in the Superior Court, Hartford Judicial District, of the crimes of Robbery in the First Degree in violation of Connecticut General Statutes § 53a-134 (a)(4) and Conspiracy to Commit Robbery in the First Degree in violation of C.G.S. §§ 53a-48 (a) and 53a-134 (a)(4). On February 21, 1991, the plaintiff was sentenced to the custody of the Commissioner of Corrections for a total effective sentence of twenty years, consecutive to a Federal sentence the plaintiff was then serving.
The plaintiff's conviction was affirmed on direct appeal.State v. Channer, 28 Conn. App. 161, cert. den'd, 223 Conn. 921
(1992).
A brief summary of the trial evidence is necessary for the court's discussion of the issues raised by the plaintiff.[1]
At the criminal trial, the State offered evidence that on June 12, 1988, Delroy Lewis was driving his Honda Accord automobile on Sigourney Street in Hartford in the company of Dawn Jones. At a traffic light, another motor vehicle, an Audi in which Channer was a passenger, pulled along side the passenger side of the Lewis car. When the light changed, the Channer vehicle swerved in front of and near the Lewis car. During this time, Jones saw a gun pointed at her from the passenger side of the Channer car though she did not know whether it was being held by the passenger or driver. At another traffic light farther along the road, the driver of the Channer car left his vehicle and told Lewis that he was going to shoot him. When Lewis turned his car into another street, the driver of the Channer car returned to his vehicle, swerved in front of and blocked the Lewis car. Jones got out of the Lewis car and asked Channer and the other person why they were acting as they were. The driver of the Channer car then got out of his car again, this time armed with a gun. He approached and kicked the Lewis car, and stated that he was going to shoot Lewis. Lewis then pulled his car around the Channer vehicle and drove away, leaving Jones at the scene. A short distance away, Lewis again stopped his car, having been followed by Channer and his unidentified driver. At this point, Jones screamed and began running toward Lewis. Channer and the unidentified driver got out of their car and approached Lewis, who also got out of his vehicle. Channer's driver then CT Page 9010 punched Lewis. During the scuffle, Lewis heard the unidentified driver order Channer to bring the gun from the car. Channer then approached with the gun and asked his unidentified driver to move because the driver was blocking Lewis. Upon seeing the gun, Lewis fled. Moments later, he looked back toward the scene and saw both Channer and the unidentified driver leaving. Channer was driving Lewis' car, while the unidentified person was driving the Audi.
During her criminal trial testimony, Jones stated that she had never seen either of the men who were in the Audi before the incident. She stated that she and Lewis went to the police station on the day after the incident. At the station, they were shown approximately ten photographs from which she selected the defendant as the person she had described as the Audi passenger. She testified that she saw the defendant again approximately two weeks after the incident at a Jamaican restaurant on Albany Avenue in Hartford. During the criminal trial, Jones made an in-court identification of the defendant. During this testimony, she stated that the defendant looked different in court, that the Audi passenger had bumps on his face, as though he had shaved. She said he had bad skin. When the prosecutor had the defendant stand up during Jones' testimony, she stated that he did not look the same, that he looked different. She said that, "This guy might be shorter." Plaintiff's Exhibit 2, Trial transcript, 65. On further direct examination, Jones confirmed that the man she picked out in a photograph at the police station was the Audi passenger. When given the opportunity to review the photographs during her testimony, she again picked out the photograph of the defendant that she had earlier selected, and she confirmed that the photograph depicted the man who was a passenger in the Audi. She commented, however, that the defendant looked different at trial.
On cross examination, Jones reiterated that the person depicted in the photograph she selected at the police station and again during her direct testimony was the Audi passenger. The photograph was identified as one of the defendant.
Delroy Lewis also testified at the criminal trial. He testified that on the date in question, as he and Jones were proceeding on Sigourney Street, two black men, one with lighter skin than the other, were in a gold Audi when the Audi was brought along side his vehicle. He then described events which lead to the two men leaving the area with his automobile. During his testimony, Lewis indicated that he had come within CT Page 9011 approximately six feet of the Audi passenger.
Lewis testified that he and Jones went to the Hartford Police Department station a few days after the incident where Lewis was shown a group of photographs. He testified that he selected a photograph of the taller, lighter-skinned individual as the passenger, who left the scene driving his Honda. The photograph Lewis had selected was, in fact, a photograph of Channer. In addition to identifying the photograph he had selected at the police station, Lewis made an in-court identification of Channer as the Audi passenger.
During cross-examination, Lewis was asked if anybody had come to him shortly after the incident and suggested to him that Channer had been involved in the incident. This he denied. He also denied that he had a brother by the name of Tred or Dred. Additionally, he denied that he had been shown any photographs of individuals who were allegedly involved in the incident by any one other than the police.
Channer testified at his criminal trial. He stated that on June 12, 1988, while he was at a Sigourney Street address, he was visited by two individuals named Pinto and Fashion. He described them as black Jamaican males, one taller and of darker complexion than the other. He said that he accompanied these men to his father's garage to look at a burgundy-colored Honda Accord. He indicated that Fashion or Pinto showed him a group of ten or so photographs taken from the car, and that he recognized one individual in one of the photographs to be a man he knew as Mitchy. He claimed that he then went to a bar where he thought he might find Mitchy, and upon seeing Mitchy he showed him the picture, while asking him questions about the car. He indicated that before he left the bar he gave Mitchy the picture.
Channer also testified at the criminal trial that he saw Lewis approximately one month after he had been arrested in connection with this incident. He indicated that he saw the red Honda parked in front of a restaurant, and he asked who owned it. When Lewis identified himself, he told Lewis that he should thank him for the fact that his car had been recovered a few days after the incident, and that it was due to his intervention that the car was not sent to New York. He testified that Lewis claimed that the car had been taken by Channer's friends. He also claimed that he had seen Lewis several months prior to the incident at a party. CT Page 9012
With respect to photographs, Channer testified that on the day after he saw Lewis, he gave a photograph of Fashion and Pinto to Lewis' brother, a man named Tred. He said that he gave this photograph to Tred as a result of a conversation he had earlier with Lewis, and because of his understanding that Lewis would look closely at the people in the photograph to determine if they were the perpetrators of the June 12th incident.
During cross examination at the criminal trial, Channer acknowledged that he was sometimes known under the names, Beling, Clifton, and Freddy. He testified that originally he lived in Jamaica before coming to New York, and eventually to Hartford. He acknowledged that he had three prior felony convictions. With ;respect to the testimony of Lewis that the two men had never met prior to the incident, Channer testified that Lewis was lying. And, he claimed that Lewis was lying when he said that he and Channer did not have a conversation subsequent to the incident. He claimed that he assisted Lewis in the ultimate retrieval of his car because once he saw the car at his father's garage and the pictures of people he recognized in the car, he met with members of the Hartford Jamaican community, and they agreed to place the car in a location where it would be readily found by the police.
During the hearing on the petition for a new trial, the court heard testimony from Denzel Stewart, who identified himself as the brother of Delroy Lewis. Stewart, who indicated that he is also known as Trey and Tred, stated that on June 12 1988, he went to Enfield Street in Hartford where he met with a man known as Bimpy, and that Bimpy showed him a photograph. He claimed that he then went to his brother, Delroy Lewis, and told him that he had information about the car. He claimed that he gave Lewis the picture he had received from Bimpy, and that Lewis brought this photograph to the police. Stewart further testified that a few days after the robbery, he and Channer spoke, and that Channer told him that he knew one of the people involved in the robbery. He said that this person had found a picture in the car, a photograph of a man known as Mitchell Moody, aka Mitchy, who has since been deported, and that Channer had shown him this picture. He stated that Channer told him that he was showing him this picture because he had heard that Lewis thought he was involved in the robbery. Stewart testified that Channer did not tell him that Mitchy was one of the robbers, but that the people who stole the car had shown him the picture, and had told him that they had CT Page 9013 found the picture in the car. Stewart claimed that he took this picture to Lewis and told Lewis that he thought Channer was trying to help them find the people who actually took his car. Later the same day, Stewart claimed, Channer showed him a picture of two men, and Stewart claimed that he then showed this second photograph to Lewis. Stewart claimed that this second photograph depicted the two men who were the actual perpetrators. Stewart testified that when he showed this second photograph to his brother, he was trying to tell him that he did not think Channer had been one of the robbers since he was, in fact, trying to give them information in an effort to help them find the car. Stewart stated that when Channer gave him this second picture, Channer told him that he knew the identities of the people in the picture and that one of them had bragged about taking the car. Stewart testified that he had told Lewis that he thought Channer and one of the individuals depicted in the photograph bore a close resemblance.
Stewart acknowledged that he did not report any of these events to the police, and he did not know if anyone had told the police that there was a mistaken identity.
Both Lewis and Jones testified during the hearing on the plaintiff's petition for a new trial. Contrary to his criminal trial testimony, Lewis now testified that prior to the criminal trial he had been shown a photograph of two men whom he recognized as the persons who had stolen his car. He stated that he had been shown this photograph by his brother, Denzel Stewart, also known as Trey. He claimed that he told someone about this at the trial before his testimony, and he claimed he told this person that he wanted to drop the case. While he could not say to whom he had reported this, it was his recollection that the person was in a responsible position in regard to the criminal prosecution, and that he told this person on the same day as the trial. He testified that later, in 1994, he gave a written statement in which he indicated that he made a misidentification at the trial, and that he was willing to testify to that extent. His statement was made an exhibit in this matter. In it, Lewis states, "My name is Delroy Lewis. I am over the age of eighteen and understand the meaning of an oath. I here by (sic) proffer and say that on June 12, 1988, I was robbed of my car by two black males in which I later identified Claudious Channer as the passenger of my assailant robber car which was a misidentification in my part. CT Page 9014
WHEREFORE I am willing to testify in Tolland County Superior Court and construe my irreparable misidentification of Mr. Channer at a date to be schedule (sic) by the Court." Plaintiff's Exhibit 1, Statement of Delroy Lewis. Lewis testified that he did not know who had prepared this affidavit for him to sign, and that it had been brought to him by his brother, Trey. Lewis also testified that he was lying at the criminal trial when he stated that he did not have a brother named Trey. And, he testified that he was lying at the criminal trial when he stated that no one had shown him photographs of people other than Channer allegedly involved in this incident. (cf. Plaintiff's Exhibit 2, Trial Transcript, 168). He also claimed that he told the police prior to his testimony that Channer was not the perpetrator, but that the police had threatened him by saying that if he did not testify that Channer had been the perpetrator, they would charge him with it.
On cross examination, Lewis testified that he gave a statement to the police a day or two after the incident, and he acknowledged that he had selected a picture of Channer from a photo array. He indicated that no one made any suggestions while he was reviewing the photographs, and that he and Jones did not review the photographs together.
With respect to his relationship to Jones, Lewis testified at this hearing that he and Jones are married, and that they have children together, through he claimed that he has not seen her since 1994. He further stated that Jones told him prior to the criminal trial that she was not sure Channer was the right person.
Jones testified at the hearing on this petitioner that she did not now believe that Channer had been one of the perpetrators. It is noteworthy that when Jones was sworn as a witness, she declined to report her address, and she stated that she still has fears concerning this incident. She also indicated that she remains afraid of the plaintiff. The court notes that Jones' demeanor as a witness was consistent with her statements concerning fear.[2] Jones testified that, at some point after her criminal trial testimony, she received a letter from Channer at her mother's home address. She indicated that she wrote back to Channer, giving him her telephone number. Her letter, dated December 10, 1990, to Channer was marked as an exhibit. Thus, it is apparent that her letter was written after her trial testimony but before Channer's sentencing. In this letter, Jones wrote: CT Page 9015 "Dear Beling Hi How are you? I am writing you to let you know that I am very sorry about what happen. I feel very bad. I don't wish these (sic) on nobody. I don't think you did it, But whoever did it should pay for it. I lost weight. Be (illegible) this I did not sleep, but I was very scared. I don't want you to go to jail for this. So you tell me what I can do to help you. If you tell (illegible) your friends I will help you every way I can. When you had a chance to tell you should have told. Here is a phone # to call me 549-3940. I don't live there. When you call tell them to call Dawn and they will call me. I am willing to help you! (Signed Dawn) P.S. I don't live on Cornwall Street. So don't write me at that address." Plaintiff's Exhibit 7, Letter from Dawn Jones. After receiving the phone call from Channer and writing back to him, Jones also signed an affidavit which was provided to Channer's criminal trial counsel. The affidavit, dated January 8, 1991 states: "My name is Dawn Jones. I am over the age of eighteen and understand the meaning of an oath. I am voluntarily giving the following statement. Attached to this statement is a copy of a letter that I wrote to Claudius Channer (Beling). Beling had written to me and this was my answer to him. In that letter I state that I do not believe that Beling was one of the people involved in the robbery of June 12, 1988. The person I saw in court looked like one of the people involved but I do not believe that Beling was one of the people I saw on June 12, 1988. I am willing to testify to this in court." Plaintiff's Exhibit 6, Affidavit of Dawn Jones.[3] With respect to other photographs, Jones testified that prior to the criminal trial she had been shown other photographs, and she recalled that one of the photographs depicted two individuals. She thought she was shown these pictures on behalf of Channer. While she was not certain who showed her the picture of the two individuals, she thought it might have been Lewis' brother Tred. At the hearing in this matter, Jones testified that the two people in the photograph were the ones who had done the crime. She also noted that one of the individuals looked like Channer.
Also testifying at this petition for a new trial hearing was James Looby, an inspector assigned to the State's Attorney's office during the investigation and trial leading to Channer's conviction. Looby met with Jones on October 18, 1990 and again on January 28, 1991, and he kept notes of these meetings. Petitioner's Exhibit 3, Notes of Inspector Looby. During his October 18, 1990 meeting with Jones, she told him that she would be available to testify at the trial if needed. She also told Looby that she and Delroy Lewis were contacted by an individual CT Page 9016 who said he was representing Channer and who wanted to know if there were interested in "settling" the case for money. Looby also met with Lewis on October 18, 1990 who told him that he, too, would be available to testify if needed. He reported that his car had been damaged, and that he had been contacted by a person who represented or said he represented Channer, and that the person had inquired about settling the case for money. Lewis told Looby he had declined, and he told Looby that he could identify Channer. Id.
During the subsequent meeting between Looby and Jones on January 28, 1991, Jones stated that Channer had mailed her a letter after the trial. She told Looby that she was fearful that Channer would do something to her or a member of her family and she was upset that Channer had obtained her mother's address. In this interview, Jones told Looby that Channer had sent her a picture of an individual who looked like the person who robbed her. She noted that the person also looked like Channer. Jones further told Looby that she had been relieved after the trial and she had felt that everything was over with, and that when the letter from Channer came to her mother's house she became very scared and concerned for her mother and herself. She told Jones that, "Channer has a lot of friends on the street and she is afraid that they might do something." Id. Jones no longer had the letter Channer had written to her.
James Howard, now an inspector with the Office of the Chief State's Attorney but then a detective with the Hartford Police Department, testified that he was present when Lewis and Jones came to the police station shortly after the incident and selected Channer from among approximately ten photographs. He indicated that Lewis and Jones were interviewed separately, and that one was not present in the same room while the other was reviewing photographs leading to their separate but identical selection of Channer as one of the robbers. Howard also indicated that from the time of the initial identifications, neither Jones nor Lewis ever contacted him to say that there had been a mistaken identification. Nor was he aware of any effort on the part of either witness to contact anyone in the Police Department to report a mistake in identification.
While the plaintiff initially asserted four claims as the basis for his petition, none but the recantation claim has any present viability. The plaintiff offered no evidence, nor could he, that the photo array leading to his identification by Jones CT Page 9017 and Lewis was tainted. No new evidence on that subject was adduced at trial. As noted, the court has already heard and disposed of the plaintiff's claim regarding the effectiveness of trial counsel in a separate habeas proceeding. And, finally with respect to claims, understanding from pre-trial conversations with the court that an assertion that the State failed to adhere to a plea agreement is not the proper subject of a petition for a new trial, the plaintiff offered no proof in its furtherance.
That leaves remaining the plaintiff's claim that he is entitled to a new trial on the basis that the victims have now recanted their trial testimony. The function of the trial court in deciding whether to grant a Petition for a New Trial brought pursuant to C.G.S. § 52-270 is to ". . . determine whether the evidence presented at the hearing on the petition together with the evidence presented at the original trial warrants the granting of the petition." Demers v. State, 209 Conn. 143 (1988). The court in Demers further stated that "The basic question which the trial court has to decide is whether upon all the evidence an injustice had been done (citations omitted) . . . and, whether it is probable that on a new trial a different result would be reached." Id., 148. The court's exercise of discretion is not, however, unbridled. Where the petition is based on a claim of newly discovered evidence, the Supreme Court, in Asherman v.State, 202 Conn. 429 (1987) has articulated the standard to be applied in determining whether to grant the petition. The court stated: "The standard that governs the granting of a petition for a new trial based on newly discovered evidence is well established. The petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial, (3) it is not merely cumulative; and, (4) it is likely to produce a different result in a new trial." Id, 434. The court is instructed, also, that a new trial should be granted on the basis of newly discovered evidence only if an injustice was done or it is probable that on a new trial a different result would be reached. Johnson v. State, 36 Conn. App. 59 (1994), citingSummerville v. Warden, 229 Conn. 397 (1994), and Taborsky v.State, 142 Conn. 619 (1955). In this case, the "newly, discovered evidence" is, in essence, the recantation testimony of both Jones and Lewis. Additionally, the plaintiff claims, as new evidence, Lewis' admission that he lied during the criminal trial. The issue of false testimony was discussed by the Appellate Court inJohnson v. State, 36 Conn. App. 59 (1994). In Johnson, the court CT Page 9018 stated, "False testimony may be of two types: (1) where a material witness admits to perjuring himself at trial or, . . . (2) where a material witness has recanted his testimony and claims he was mistaken as to what he said at trial." Id., 64. TheJohnson court further opined: "In analyzing a petitioner's claim under these circumstances, a new trial should be granted when (1) the court is reasonably well satisfied that the testimony of a material witness is false, (2) without it the jury might have reached a different conclusion, and (3) the party seeking a new trial was taken by surprise when the false testimony was given.
In this case, the court is unpersuaded that the criminal trial testimony of either Lewis or Jones was false with respect to their initial identification of Channer from a photo array, or that their testimony during the criminal trial identifying the photograph they had selected a few days after the incident was false. Nor has the plaintiff proven any error in the criminal trial testimony of either Jones or Lewis that he was the person whose photograph they had selected as a perpetrator at the police station.
The plaintiff has proven, however, that Lewis testified falsely at the criminal trial about being shown any pictures by individuals other than the police prior to the trial. The court believes that prior to the criminal trial it is likely that Lewis was shown at least one photograph by his brother Trey, and that Trey had received this photograph from Channer. While this belief, by necessity, implicates the truthfulness of Lewis's criminal trial testimony, it also serves to demonstrate Channer's unusual interest in the matter shortly after its occurrence. The court does not find this discrepancy material to the issue of Channer's culpability, or to the fairness of the underlying criminal trial, however, since there was no credible evidence that either Lewis' or Jones's initial identification of Channer as one of the perpetrators was tainted.
The court also finds suspect the recantation testimony of both Lewis and Jones. It is clear to the court from Jones' testimony in this matter that she is afraid of the plaintiff, and that this incident still instills fear in her. It is also apparent to the court that the exculpatory statements and testimony given by Jones subsequent to the criminal trial, including her testimony before this court, are the product of fear and intimidation. As such, they can not be credited. Jones was firm in her testimony at the criminal trial that Channer was CT Page 9019 the Audi passenger, one of the perpetrators of the crime. She was vigorously cross examined by capable counsel. Her fear-laden recantation testimony does not diminish the credibility of her criminal trial testimony.
Lewis presents a mixture of credibility and incredibility. While he was not forthcoming in his criminal trial testimony concerning efforts made prior to the trial on behalf of Channer to show him photographs of other likely offenders, and he provided false testimony concerning the identity of his brother, Denzel Stewart, aka Trey, aka Tred, the falseness of this testimony does not directly implicate the accuracy of his identification of Channer. As to his admission that he lied during the criminal trial, neither the motivations for his initial testimony denying the existence of his brother and denying that he had viewed other photographs, nor the cause of his present change of statement are clear to the court. While the court did not have the opportunity to observe his demeanor at the criminal trial, the court did not find him to be a credible witness at this hearing. Suffice to say that Lewis' testimony, without corroboration from Denzel Stewart, would be entitled to little credit from the court. From Denzel Stewart, however, the court does believe that Lewis was, in fact, shown other photographs prior to the trial, and that Stewart is, indeed, a brother whose existence he failed to acknowledge at the criminal trial. From these facts, the court concludes no more than that Lewis is a perjurer. The realization of this information, however, does not lead the court to believe that the underlying trial resulted in an injustice, or that the availability of this information would have lead to a different result. Channer has not demonstrated that Lewis' direct and identifying evidence would have been eroded by proof that he had seen other photographs before the trial, including one of an individual resembling Channer. The court finds, moreover, that Channer has failed to prove that Lewis' criminal trial testimony concerning his initial identification of Channer was inaccurate or unreliable.
Similarly, the court is unpersuaded that Lewis' subsequent doubts ripening into certainty are entitled to be believed. The Appellate Court has stated, "Recantation as grounds for a new trial has always been viewed with skepticism. Well over one hundred years ago, our Supreme Court enunciated this skepticism in Shields v. State, 45 Conn. 266, 270 (1877) as follows: `After a trial is over and the accused stands convicted, with the heavy CT Page 9020 penalty of the law impending and just ready to fall upon him, how easy by artful or even honest suggestion to awaken a sympathy even in the heart of the victim, who was the main, perhaps only witness against the accused, and who naturally feels responsible for the conviction' and how easy for such witness by a process of speculation, colored by feeling, to feel and express a doubt about the correctness of the opinion entertained at the time of the transaction.'" Johnson v. State, 36 Conn. App. 59 (1994)
The court does not find that the material testimony given by either Jones or Lewis at the criminal trial was false. cf.Pradlik v. State, 131 Conn. 682, (1945). Nor does the court find their "recantations" as worthy of credit. Accordingly, the petition for a new trial is denied. Judgment may enter for the defendant.
Bishop, J.