[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON FIFTH AMENDED PETITION FOR NEW TRIAL (AS TO COUNT ONE ONLY)
I. INTRODUCTION
CT Page 7057
On October 11, 1990, at 4:34 in the morning, the New Haven police received a complaint of a disturbance followed by gunshots at a small apartment house located at 634 Howard Avenue. Officers arrived within minutes and discovered a horrific scene. Two men — their bodies still warm — were shot dead in an upstairs bedroom. Their names were Ricardo Turner and Lamont Fields. There were no obvious suspects. The prominence of one of the victims (Turner had been an alderman) and the mystery of their killer's identity aroused much interest in the New Haven community.
Much later, two men — Stefon Morant and Scott Lewis — were arrested for the Turner-Fields homicides. Morant and Lewis were separately tried and convicted, and their respective convictions have been affirmed on appeal. State v. Lewis, 245 Conn. 779, 717 A.2d 1140
(1998); State v. Morant, 242 Conn. 666, 701 A.2d 1 (1997). It turns out, however, that the Morant-Lewis litigation has not ended there.
In 1995, on the complaint of Lewis, the Federal Bureau of Investigation (FBI) began an investigation focasing on a New Haven police detective named Vincent M. Raucci, Jr. Detective Raucci had played a prominent role in the police work leading to the arrests and convictions of Morant and Lewis. A few months after the homicides, Raucci had taken statements from one Ovil Ruiz. Ruiz was a young man with a criminal past whose eventual testimony played an important role in the Morant and Lewis trials. (Statev. Lewis, supra, terms Ruiz "the state's key witness" in its case against Lewis. 245 Conn. at 782. Ruiz may not have enjoyed quite such exalted status in the case against Morant because of the extensive corroboration of his testimony in that case; State v. Morant, supra,242 Conn. at 679-81; but he was plainly an important witness.) Ruiz, when interviewed by the FBI, recanted his trial court testimony and alleged, instead, that Raucci had conspired with him to "set up" Morant and Lewis as suspects in the homicides. As a result of these allegations, Morant and Lewis filed petitions for new trials.
While Lewis' name can hardly be avoided, only the Morant case is before me. The case has been tried to the court. After carefully considering the voluminous evidence ably presented by the parties, I have concluded that, for the reasons set forth below, Morant's petition must be denied.
II. THE PROCEDURAL SETTING
As mentioned, the Turner-Fields homicides occurred on October 11, 1990. Morant was arrested pursuant to a warrant in late February or early March, 1992. (The warrant was signed on February 26, 1992, and Morant was arraigned on March 2, 1992.) The State eventually filed a substitute CT Page 7058 information charging Morant with two counts each of the crimes of murder and felony murder. The case was tried to the jury before Hadden, J. On June 8, 1994, the jury found him not guilty on the two counts of murder and guilty of the two counts of felony murder. On November 4, 1994, Judge Hadden imposed consecutive sentences of 35 years on each count, for a total effective sentence of 70 years. On August 26, 1997, the Supreme Court affirmed. State v. Morant, supra.
The present petition for new trial was commenced by service of process on April 4, 1997. Trial on Morant's second amended three-count petition commenced before Hadden, J. on April 28, 1999. On April 29, 1999, Hadden, J. declared a mistrial on the first count, the third count was withdrawn, and, by consent of the parties, the trial continued on the second count alone. On July 26, 1999, Hadden, J. filed a memorandum of decision (no. 117) finding against Morant on the second count. I have not been asked to revisit that count. On October 13, 1999, following complete disclosure of the FBI file, Morant filed a third amended petition as to count one only. That count alleges newly discovered evidence as a result of the FBI investigation. The first count was tried before me over the course of seven trial days in late October and early November 1999. Following posttrial briefing, the case was argued on December 20, 1999.
The December 20, 1999 argument proved to be unusually eventful. Morant had not testified at the Fall 1999 hearing, just as he had not testified in his original criminal trial. In the course of the December 20, 1999 argument, Morant's counsel moved that the evidentiary portion of the hearing be reopened so that Morant might testify. This motion was granted by the Court, and an April 2000 hearing date was set.
On January 24, 2000, Morant filed an "amended third amended petition for new trial." This amended petition adds additional allegations concerning Ruiz's recantation and additionally incorporates certain allegations concerning Ruiz's initial interview with the New Haven police. On February 4, 2000, the State filed a return together with a special defense that Morant's new allegations had not been brought within three years of the judgment in Morant's criminal case, as required by Conn. Gen. Stat. § 52-582.
An additional evidentiary hearing was held on April 11, 2000. Morant testified at that hearing on his own behalf, and Vaughn Maher, a retired police detective, testified for the State.
Following the additional hearing, on April 17, 2000, Morant filed a Fifth Amended Petition for New Trial. (Morant recognizes in his request for leave to file his Fifth Amended Petition that, "Petitioner's Amended
Third Amended Petition should more properly have been entitled his Fourth CT Page 7059 Amended Petition.) This petition adds allegations that a tape-recorded statement Morant gave to the police was coerced and untrue and that Morant was, in fact, "in the Carolinas" at the time of the killings in question.
Argument was held on May 22, 2000. The parties filed supplemental briefs on May 23, 2000.
III. STANDARDS FOR GRANTING NEW TRIALS.
"Connecticut has long recognized petitions for new trials based on newly discovered evidence." Johnson v. State, 36 Conn. App. 59, 63,647 A.2d 373, cert. denied, 231 Conn. 946, 653 A.2d 827 (1994). Johnson
sets forth the currently accepted standards for granting such petitions.Channer v. State, 54 Conn. App. 620, 626-30, 738 A.2d 202, cert. denied,251 Conn. 910, 739 A.2d 1247 (1999). As Johnson explains:
 [A] new trial is granted if the petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence (1) is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence, (2) would be material on a new trial, (3) is not merely cumulative, and (4) is likely to produce a different result in a new trial. . . . In analyzing the foregoing factors, trial courts are guided by the general principle that a new trial should be granted because of newly discovered evidence only if an injustice was done or it is probable that on a new trial a different result would be reached.
36 Conn. App. at 63-64. Johnson goes on to explain, however, that a somewhat different standard applies where a petition for new trial is "based solely on a claim of false testimony, i.e., recantation." Id. at 64.
 In analyzing a petitioner's claim under these circumstances, a new trial should be granted when (1) the court is reasonably well satisfied that the testimony of a material witness is false, (2) without it the jury might have reached a different conclusion, and (3) the party seeking a new trial was taken by surprise when the false testimony was given.
Id. at 65. (Footnote omitted.)
There are thus "two standards applicable to petitions for new trials CT Page 7060 based on newly discovered evidence — one for false testimony and one for all other evidence." Id. at 67. In analyzing the first count of the petition now before the court it is clear that the false testimony standard is the standard to be applied. Johnson refers to this standard as "the Pradlik standard," after Pradlik v. State, 131 Conn. 682,41 A.2d 906 (1945). 36 Conn. App. at 65. The Pradlik standard is the standard that must be employed here.
The second prong of the Pradlik standard has been the subject of some confusion. Johnson, a mentioned, articulates that prong as requiring that, "without [the false testimony] the jury might have reached a different conclusion." 36 Conn. App. at 65. Johnson, however, appends an important footnote to the word "might." The footnote explains that, "There has been some dispute as to the applicable standard of proof under this standard, i.e., whether a new jury `might,' or `would probably,' have reached a different result." Id. at 65 n. 9. Johnson found it unnecessary to resolve this issue. Id. The dispute has recently been resolved in Channer v. State, supra. Channer explains that the test is whether the availability of the new information "would have led to a different result." 54 Conn. App. at 632. This standard is, as Channer
explains, one articulated by our Supreme Court in Lombardo v. State,172 Conn. 385, 374 A.2d 1065 (1977). Lombardo states that the newly discovered evidence "must be evidence which persuades the judge that a jury would find [the defendant] not guilty." Id. at 391. See Channer v.State, supra, 54 Conn. App. at 631. This is consistent with the standard articulated by the Second Circuit in United States v. Stofsky, 527 F.2d 237,246 (2d Cir. 1975), cert. denied, 429 U.S. 819 (1976). Channer is plainly binding on this Court, and its standard must be employed here.
Given Channer's modification of Johnson, the current Connecticut standard for granting a new trial on a claim of false testimony (i.e. recantation) can be articulated in the form of the following three-pronged test: (1) the court must be reasonably well satisfied that the testimony of a material witness is false; (2) the availability of the newly discovered information would have led to a different result; and (3) the party seeking the new trial was taken by surprise when the false testimony was given. This test must be applied here.
III. MORANT'S CRIMINAL TRIAL.
The three-pronged test just articulated obviously requires reference to the petitioner's original criminal trial. Morant's criminal trial must now be described.
A full statement of the facts that the jury in Morant's case could reasonably have found is set forth in State v. Morant, supra, 242 Conn. CT Page 7061 at 668-70. That statement is also contained in Judge Hadden's memorandum of decision in this case, and there is no need to repeat it yet again here. Familiarity with that statement is assumed. It is, however, necessary to describe some of the evidence at trial with particularity in order to analyze properly the claims in this case.
As mentioned, the testimony of Ovil Ruiz played an important part in the trial. Stated briefly, Ruiz testified that he had, as a sixteen-year-old, sold drugs for Lewis and Morant. (T. 695.) Turner held the drugs and the cash in the same operation. (T. 706.) On the evening prior to the homicides, Ruiz heard Lewis tell Morant that Turner planned to abscond with his money and drugs. (T. 709-10.) Morant said, "[W]e do what we got to do." (T. 710.) At Morant's instruction, Ruiz retrieved two handguns — a .357 and a .38 — from a hiding place. (T. 716.) Lewis drove Morant and Ruiz to Turner's house on Howard Avenue. (T. 720.) After they parked, Morant told Ruiz to hop into the front and keep the car running. Morant and Lewis then went up into the apartment with the guns. (T. 722.) Ruiz saw an old friend of his named Millie and started talking with her. After about half an hour, he heard some shots and made a u-turn. Morant and Lewis quickly entered the car and threw some bags in the back seat. (T. 723.) Lewis asked, [D]o you think they're dead?" Morant replied, "[F]uck it, you know, it's like whatever happened, happened." (T. 725.) Some weeks after the homicides, Ruiz saw Lewis throw the .357 handgun into the river off the Chapel Street Bridge in the presence of Morant. (T. 730-31.)
Ruiz's testimony, important as it was, was very far from the only evidence in the case that was damaging to Morant. First, and perhaps foremost, there was uncontradicted evidence that Morant "gave a statement to police in which he admitted that he was with Lewis during the early morning hours of October 11, 1990." State v. Morant, supra,242 Conn. at 669. This statement was given on January 16, 1991. Although the statement was given to Detective Raucci, whose personal credibility is now under attack, the statement was tape recorded, and its authenticity (as distinct from its credibility) is not in dispute. In a crucial portion of his statement, Morant is recorded as stating the following concerning his sojourn with Lewis:
 I was in the vehicle coming from, he was bringing me home. He said he had to take care of some business first, so I said "alright." So, you know what I'm saying, we was riding, out drinking, we was riding, then we got some address on Howard Avenue, he said, "Yo, wait here, I'll be back." So I said alright. You know what I'm saying, I was just sitting in the car listening to music, he went upstairs, you know what CT Page 7062 I'm saying, five, ten minutes past and he came run, running down the steps, jumped in the car, sweating and shit, what the fuck's going on with him. You know what I'm saying. He didn't say anything, just "chill," just "chill," and then we just drove off and then he brought me home."
Ex. B, p. 3. Although this statement falls short of an actual confession to participation in the homicides, it is deeply inconsistent with at least two of Morant's fundamental propositions. It is, in the first place, deeply inconsistent with Morant's alibi evidence that he was in North or South Carolina at the time of the homicides. It is, in the second place, deeply inconsistent with the fundamental proposition of Ruiz's recantation, discussed below, that neither Morant nor Lewis had anything to do with the homicides and that the homicides were, instead, committed by a completely different coterie of felons. Absolutely no evidence was presented at the criminal trial to call the voluntariness of Morant's statement into question, and the jury was plainly entitled to give it significant weight. (The evidence concerning Morant's statement presented in this case is discussed later in this opinion.)
There was other evidence submitted at trial supporting the State's case that has not in any way been attacked in the proceedings here. As Statev. Morant recounts, Diane Basilicato testified that she lived in the apartment next to the victims' apartment and that shortly after 4:00 A.M. on October 11, 1990, she heard a banging and then two people running down the apartment building's stairs. 242 Conn. at 680. Jose Roque stated in a tape-recorded statement that Morant told Lewis, "you did what you had to do." Roque further stated that he had seen Lewis throw the murder weapon off the Chapel Street Bridge, an observation consistent with Morant's own statement. Id. (Although Roque disavowed his statement at trial, the credibility and weight of that matter was plainly for the jury. Roque did not testify at the proceedings before me.) Certain forensic evidence also corroborated Ruiz's testimony. Id. at 681. Beyond this, Helen Gray, a witness who had supervised Fields in her capacity a supervisor of custodial services at Yale Divinity School and whose credibility has never been called into question, testified that she had seen Morant in the company of Fields on three different occasions. (T. 522.) This testimony was left unshaken by evidence presented in the proceedings before me indicating at best that Morant had not been seen in the company of Turner.
Finally, because of the extensive evidence in the proceedings before me dealing with Ruiz's contacts with Raucci, it will be helpful to briefly recount the evidence on this issue presented at Morant's original criminal trial. Ruiz testified that he was, at the time of his testimony, CT Page 7063 a sentenced prisoner. (T. 684.) He gave his original statement to Raucci in January 1991 after being arrested for an assault on Spring Street. (T. 731.) When asked whether Raucci had "turn[ed] the tape recorder on and off and [said] you say it this way, " Ruiz replied, "I just told him what happened." (T. 734.) This was on direct examination by the State. On cross-examination by Morant, Ruiz testified that, while he didn't remember the exact date, this was "maybe" in January 1991. He also testified that, "I was in jail for two months" and then "arrested like in a month." (T. 763.) In addition to his January statement to Detective Raucci, he had given a second statement in May 1991 in the presence of his attorney. (T. 769.)
Raucci also testified concerning Ruiz's statements. Ruiz's first statement was tape recorded on January 14, 1991. (T. 870.) Raucci took a second statement from Ruiz in the office of the State's Attorney in May 1991. (T. 876.) This was on direct examination. On cross-examination, Raucci testified that Ruiz had "volunteered" his January statement after he had been arrested for assault. He indicated that this was on January 14, 1991. (T. 883.) Raucci testified that Ruiz's second statement — that of May 1991 — had been initiated by his attorney. (T. 888.)
There was a factual dispute at the original criminal trial concerning the tape-recorded statement of Jose Roque. Roque testified that Raucci kept stopping the tape and telling him what to say. (T. 623.) Raucci denied this allegation. (T. 870.) This was all grist for the jury's mill. No new evidence concerning the Roque statement was presented at the hearing in this case.
IV. RUIZ'S RECANTATION.
Much of the evidence presented in this proceeding has focused on Ovil Ruiz. To some extent, the evidentiary hearing in this case was a production of Hamlet without the prince, since Ruiz, obviously a major character in the drama, took the Fifth Amendment when called to the stand. Ruiz's February 1996 recantation nevertheless remains a linchpin of Morant's present case.
Ruiz was interviewed by the FBI on February 22, 1996. He initially gave the FBI a story consistent with his testimony at Morant's criminal trial. After he was informed that Raucci had recently been suspended from the police force and arrested on criminal charges, Ruiz lost his composure and stated that he had "been living for five years with a terrible secret which he could no longer contain." (Ex. 25A, p. 4.) The FBI report on this interview continues as follows:
 After regaining his composure, RUIZ stated that he CT Page 7064 had lied under oath about SCOTT LEWIS and STEPHAN MORANT being involved in the aforementioned homicides and the [sic] LEWIS and MORANT were innocent of those murders. RUIZ stated he knew who committed the murders because he was there and LEWIS and MORANT were not there and had been framed. RUIZ stated his testimony was essentially true but that he had substituted the names of LEWIS and MORANT for the identities of the real killers.
. . . .
 Sometime after the double homicide, RUIZ agreed to help "set up" LEWIS and MORANT to be arrested for the crime. RUIZ stated he met with Det. RAUCCI to plan the "set-up". During his meetings with RAUCCI, RUIZ was told that in order to make the story more credible, RUIZ was to shoot an "enemy", a drug dealer competitor, after which shooting RUIZ would be arrested by RAUCCI. Following his arrest, RUIZ would cooperate with RAUCCI and cut a deal to give up LEWIS and MORANT for the double homicide. RUIZ was told that for him to give up evidence on a double homicide after being busted on anything less that [sic] a shooting, he would not be believed.
(Id. at 4, 6-7.) The reason for this "set up," according to Ruiz, was that Lewis owed a great deal of drug trafficking money to another drug dealer who was assertedly in partnership with Raucci in the drug trade. (Id. at 7.)
These are unquestionably spectacular allegations. If true, there could be no doubt that Morant would be a victim of the grossest injustice and entitled to a new trial as a matter of course. It must be recalled, however, that Ruiz has not testified in this case, and his credibility cannot be assessed in the same manner as that of a witness who testifies under oath and subject to cross-examination. When Ruiz testified under oath and subject to cross-examination — at Morant's and Lewis's criminal trials — he gave a quite different story. The best that can be done under the current circumstances is to test Ruiz's recantation by other credible evidence. As will be seen, it does not stand up well.
V. THE TORRES SHOOTING.
Ruiz told the FBI that Raucci had ordered him to shoot a drug dealer competitor, after which Ruiz would be arrested by Raucci and give up CT Page 7065 Lewis and Morant for the double homicide. This version of events simply cannot be reconciled with the documentary evidence. It is true that Ruiz was arrested on January 15, 1991, on a charge of assault in the first degree. Judicial notice is taken of the file in Ruiz's criminal case.State v. Ruiz, No. CR6-336901 (N.H.J.D.) That file shows that Ruiz was arrested on a warrant for a December 19, 1990 shooting on Spring Street in New Haven. Ruiz eventually entered a plea of guilty to the charge. On March 29, 1993, he was sentenced by Ronan, J. to a term of 12 years, execution suspended after 6 years with three years of probation. That sentence was made consecutive to another sentence that Ruiz was already serving at that time, imposed in State v. Ruiz, No. CR6-378038.
The original police report on the December 19, 1990 shooting is in evidence. (Court's Ex. 1.) That report, prepared by Detective Raucci on December 20, 1990, presents a significantly different scenario than that described by Ruiz. Because of its importance to the case, this report must be described in some detail.
The report states that Detective Raucci was called to Yale-New Haven Hospital on the evening of December 19, 1990, at 2107 hours, on the report of a shooting victim. The victim, Javier Torres, reported that he had been walking on Spring Street with another man, Jose Fret, when a vehicle pulled up and four Latin men exited and fired at him. Torres said he did not know any of the men. Fret said he knew two of them and that one was named Jose Aponte and the other "Victor."
The report then states that the detectives working on the case located an "individual who associates with the Wolcott Street Boys" who wished to remain anonymous. The report goes on to say that:
 The source said it had been in the company of Jose Aponte early on 12-19-90 at about 1900 hours. Aponte was with three other Latin males and told the source they were going into the Hill section of New Haven to attend a party. The Liberty Street Possie [sic] are based in the Hill section and the source was told by Aponte that he had two weapons in the car just in case they run into a rival gang member. The source said that Aponte was operating his blue Datsun with the rear bumper missing and has gold rims. Present inside the car with Aponte was one Fernando Rivera and Victor Rosario, and fourth male was not known to the source. The source said it was further willing to assist by taking Detective Donnolly and myself to where the vehicle used in the shooting was located. CT Page 7066
 The source was driven to 140 Russell Street where we observed a Datsun 310, color blue, bearing Connecticut plate 999-FXW. The source said the plate did not belong on the vehicle and in fact belonged to a relative of Jose Aponte. . . . The source said that Fernando Rivera resides at 140 Russell Street. . . .
(Court's Ex 1, p. 2.)
With this report in mind, it is helpful to turn to the arrest warrant application seeking Ruiz's arrest for the Torres shooting, prepared by Detective Raucci on January 9, 1991. (Ex. 12.) The application states that, "On January 7, 1991 . . . a formal taped statement was taken from Jose Aponte in the presence of his attorney." Aponte stated that the person who shot Torres was "known to him as `Blockhead' and resides on Ferry Street next to Rocco's Bakery with a girlfriend named Awilda." Raucci then states that "Blockhead is a person known to this affiant as being one Ovil Ruiz Latin male, 03-09-74, of 428 Ferry Street." The report goes on to state that:
 A check through the United Illuminating Company revealed there is a service at 428 Ferry Street Apartment Number 2, in the name of Awilda Marrero. This address is located next door to Rocco's Bakery. The source who assisted this affiant the night of the shooting is in fact one Ovil Ruiz, also known as "Blockhead," and that I dropped Ruiz at 428 Ferry Street after he assisted the police. Refer to police report for details.
(Ex. 12.) The arrest warrant application was signed by Stanley, J. on January 11, 1991. (Id.)
These documents — the December 20, 1990 police report and the January 9, 1991 arrest warrant application — are themselves sufficient evidence that Ruiz's recantation is an undocumented work of fiction. It is, of course, intrinsically implausible that anyone would engage in the exceedingly dangerous act of shooting a drug dealer competitor solely in order to get himself arrested and to subsequently engage in the perhaps even more dangerous act of framing two wholly innocent men — also drug dealers — for a double homicide. The problems with Ruiz's recantation, however, go well beyond intrinsic implausibility. According to his recantation, he and Raucci cooked up this entire scheme prior to the shooting. The record clearly shows, however, that Ruiz met with Raucci after the shooting, in his capacity as anonymous "source," and, rather than turning himself in so that he could CT Page 7067 begin to frame Lewis and Morant, went to great lengths to implicate Jose Aponte in the Torres shooting. It was only after much police work — police work which, from the documents submitted, appears to have been eminently professional — that evidence implicating Ruiz in the Torres shooting was uncovered. This is wholly inconsistent with Ruiz's claim of a preexisting conspiracy between him and Raucci to do the shooting.
One final ultra-Machiavellian thought must be considered with regard to this scenario. It is true that both of these documents — the December 20, 1990 police report and the January 9, 1991 arrest warrant application — were written by Detective Raucci. Could Raucci simply have made up the wealth of detail in these reports in order to cover his tracks? The likelihood of this hypothesis is microscopic. Numerous persons other than Raucci and Ruiz are named in these reports. These persons include not just street criminals but law enforcement officers and Ruiz's attorney. No one has stepped forward to say that these reports are erroneous in any detail. In addition, the very fact that the arrest warrant application was not prepared until almost a month after the Torres shooting is itself completely inconsistent with Ruiz's description of a pre-shooting conspiracy. The overwhelming evidence demonstrates that Ruiz's description is not credible.
VI. RUIZ'S JANUARY 14, 1991 STATEMENT.
There was evidence helpful to Morant presented at the hearing in this case, and that evidence must now be described. This evidence was the testimony of Michael J. Sweeney. Sweeney, who retired from the New Haven Police Department in 1998 with the rank of lieutenant, was a credible witness. In January 1991, Sweeney was a detective sergeant, in which capacity he supervised Detective Raucci. Sweeney knew Raucci in a professional capacity for more than 10 years. (10/25/99 T. 11.) Sweeney's testimony specifically concerned Ruiz's statement to Raucci on January 14, 1991. That testimony establishes that the statement in question was obtained under suspicious circumstances.
Ruiz was arrested by warrant on January 13, 1991. Before bringing Ruiz to the police station, Raucci drove him around New Haven for a period of time. During this drive they viewed one or more of the locations involved in the Turner-Fields homicides. (Ruiz's eventual statement hinted at the existence of a prior driving tour, and Raucci admitted as much in his deposition; Ex. 24, p. 28.) Ruiz was then brought to the Detective Division for questioning.
Sweeney interviewed Ruiz alone for more than half an hour. (10/25/99 T. 13.) The questioning concerned the Turner-Fields homicides. Ruiz CT Page 7068 indicated that he knew nothing about the murders. At that point, Raucci arrived at the Detective Division. Sweeney and Raucci then jointly interviewed Ruiz. Ruiz once again stated that he knew nothing about the homicides. (Id. 14.) Raucci then began giving Ruiz facts about the case. Sweeney thought that this was inappropriate and asked Raucci to step out of the room. Sweeney told Raucci not to tell Ruiz anything about the case, and Raucci agreed. The two of them again confronted Ruiz. Raucci told Ruiz that he would let him go, although he was arrested on an arrest warrant, that he wanted Ruiz to tell him about the case, that he was driving the car that night, and that it was in Ruiz's best interest to give a detailed statement. (Id. 15.)
At this point, Ruiz started changing his statement. At the same time, however, Raucci began to give Ruiz additional details. Raucci told Ruiz about the Clay Street house (there was evidence at the trial that Morant and Lewis sold drugs from a house on Clay Street) and described the building. Raucci also described a scenario about guns in a gym bag. Sweeney took Raucci out in the hall a second time and told him to knock it off. (10/25/99 T. 16.)
Sweeney became preoccupied with other matters. Raucci went back to confront Ruiz alone. After a period of time, Raucci emerged and reported that Ruiz wanted to give the whole case up. Sweeney then went in with Raucci to listen to Ruiz. Ruiz said that he had been driving the car that night. He further said that he had driven to Clay Street where they obtained two guns in a gym bag and then drove to Howard Avenue where Morant and his partner took the bag and went up in the apartment. He heard shots. Morant and his partner came back to the car, and they drove off. (10/25/99 T. 17.)
Sweeney told Raucci to step out of the room. (10/25/99 T. 17.) Sweeney then confronted Ruiz and asked him if he was telling the truth. Ruiz responded that he was not telling the truth and that the information he had given had come from Raucci. After Sweeney reported this to Raucci, Raucci requested another interview with Ruiz. Raucci came out a short period of time later reporting that Ruiz was now saying that he wasn't present and had "overheard these two people talking about the case." (Id. 18.)
Sweeney's shift had now ended, and he was replaced by Detective Joseph Pettola. (10/25/99 T. 19.) Sweeney did not see Ruiz again. Other evidence in the case establishes that Ruiz's tape recorded statement was taken between 12:50 A.M. and 1:20 A.M. on January 14, 1991. (Ex. 9.) Sweeney did not witness that statement.
A transcript of Ruiz's tape recorded statement, signed by Ruiz, is in CT Page 7069 evidence. Ruiz states in that statement that he had worked for Lewis selling drugs for two years. He further stated that he had overheard a conversation between Lewis and Morant in which they said that "they had shot two guys." According to Ruiz, Lewis said, "I shot him because . . . he tried [to] run away with my money and my drugs." Morant replied. "Well, you had to do what you had to do, so you did it." (Ex. 9, p. 8.) At a later time, according to Ruiz, he saw Lewis throw the murder weapon into the water near the Chapel Street Bridge in Morant's presence. (Id. at 14.)
Sweeney's testimony must now be revisited briefly with this statement in mind. Sweeney credibly testified that Raucci gave Ruiz a number of details about the case — the location and color of the house and the color of the car are typical examples. Sweeney did not, however, testify that Raucci gave Ruiz the names of Morant and Lewis. The following interchange between Sweeney and the Court at the evidentiary hearing in this case is significant:
 THE COURT: . . . . [I]n your presence, did the names of Lewis and Morant come first from Detective Raucci or first from Mr. Ruiz? If you remember.
MR. SWEENEY: I can't remember, sir.
(10/26/99 T. 50.)
It should be recalled that, in the February 22, 1996 recantation upon which Morant bases much of his case, Ruiz told the FBI that "with respect to the FIELDS/TURNER homicides, most of his story is true, except that LEWIS and MORANT were not present." (Ex. 25A, p. 6.) If it is indeed the case that most of Ruiz's testimony was true, the fact that Raucci may have given him some of the details described by Sweeney in his testimony, while troubling, is not sufficient under these circumstances to overturn Morant's convictions. Most of the details that Sweeney describes Raucci as supplying to Ruiz are not even matters in dispute. The factual matter that is in dispute is whether the killers were Lewis and Morant or entirely different persons. There is nothing in Sweeney's testimony to suggest that Ruiz's testimony on this supremely important point was inaccurate in any way.
VII. RUIZ'S MAY 28, 1991 STATEMENT
The evidence establishes that Ruiz remained in custody from the time of his arrest on January 13, 1991, to March 19, 1991, when he was released on a promise to appear. Ruiz was rearrested on April 11, 1991 and has remained in the custody of the Department of Correction since April 12, CT Page 7070 1991. Judicial notice is taken of the file in State v. Ruiz, No. CR6-340398 (J.D.N.H.), which shows that Ruiz was arrested on April 11, 1991, on larceny and narcotics charges. He eventually entered pleas of guilty to these new charges and, on March 29, 1993, received a sentence of three years concurrent with the sentence he received on that date for the Torres shooting. (These facts are consistent with Ruiz's testimony at Morant's criminal trial that he was in jail for two months and then released for about a month. T. 763.)
On May 28, 1991, Ruiz — who on this occasion used the name of Augustin Castro — gave a detailed tape recorded statement in the office of the State's Attorney. He signed a written transcript of the statement (Ex. 10) on the following day. The statement was given to Detective Raucci in the presence of Ruiz's own attorney, Michael Moskowitz.
Ruiz's May 28 statement adds a significant detail to the statement he gave on January 14. Ruiz told Raucci in this statement that he obtained guns for Lewis and Morant and drove them to the scene of the crime. His narrative continues as follows:
 And then we park at the corner so then Scott and Stephon got out of the car. So then Stephon told me jump in the front seat and keep the car warm, so I kept the car warm, I jumped in the front seat and I seen this girl Melli and I was talking to her and I said so what's up Melli and all she asked me what I was doing here and I said I was waiting for some friends that went up to the house to pick up some money and some drugs. So now we just stood up there so next thing I know I heard a couple of gun shots and then Melli just jumped back and she thought there was people shooting at us so I just shut the car and drive, you know what I'm saying and stop in the middle of the street in front of the house and they ran, down, down the stairs, Stephon and Scott. Stephon had a bag, the Puma back with the drugs and Scott Lewis had the bag with the money so then when they jump in the car they shot all the bags in the back seat so then I just drove off.
(Ex. 10, p. 6.)
Ruiz's May 28 statement is, of course, more damaging to Morant and Lewis than was his January 14 statement. While both statements were given to Raucci, the sequence and circumstances of these statements are not CT Page 7071 consistent with the Svengali-like character that Morant considers Raucci to have been. If, as Ruiz states in his recantation, he and Raucci had conspired to frame Lewis and Morant for a month or so prior to his January arrest, it is hard to understand why he and Raucci did not make Ruiz's January statement more incriminatory than it was.
Beyond this consideration, the circumstances of the respective statements must also be considered. The January 14 statement was given in the police department, under circumstances in which Raucci had considerable (although far from total) control. The May 28 statement was taken in the office of the State's Attorney and in the presence of Ruiz's own attorney. Raucci surely had less control over the May statement than he had enjoyed in the context of the January statement. Yet the May statement is the more damaging of the two. Are we to assume that Ruiz' s attorney — an experienced and respected member of the bar — was also a member of conspiracy? No evidence supporting such a hypothesis has been submitted. The more logical explanation is the obvious one. Ruiz had decided by May 28, 1991 to divulge more accurate details of the crime. The question as to whether he was motivated more by conscience or by self-interest is interesting but beside the point. The real question is whether the story he gave was true or false. When it is recalled that Morant's own statement puts him in the car with Lewis at the scene of the crime, Ruiz's May 28 statement sounds very true indeed.
VIII. RUIZ'S LATER HISTORY
Judicial notice is taken of the file in State v. Ruiz, No. CR6-378038, which shows that Ruiz was arrested on March 24, 1993 for possession of a weapon in a correctional institution. On March 29, 1993, he entered a plea of guilty received a sentence of one year to serve. The sentences that he received on the same day for the assault, larceny and narcotics convictions discussed above were made concurrent to each other but consecutive to the sentence for the weapon conviction.
Ruiz testified in Morant's criminal trial on June 1, 1994. (T. 681, et seq.) His trial testimony was consistent with his May 28, 1991 statement. (See especially T. 722-25.)
State v. Lewis, supra, refers to Ruiz as "the state's key witness" in Lewis' trial. 245 Conn. at 781. The Superior Court file in that case indicates that Lewis' trial occurred in May 1995. State v. Lewis, No. CR6-402583 (N.H.J.D.).
Ruiz was initially interviewed by the FBI on February 22, 1996. His statements in that interview are discussed supra. CT Page 7072
Shortly after the February 22, 1996 interview (the exact date is uncertain), Ruiz wrote a letter to Lewis in which he declared that he had sent "2 innocent guys to jail" and that he had told the FBI "the truth." (Ex. 5.)
On October 24, 1996, the FBI interviewed Ruiz for a second time. This time, Ruiz gave a somewhat different story than he had given on February 22. According to the FBI report, "Ruiz stated that contray [sic] to previous statements, he was present during the murders with Raul Luciano and Eloy Cruz . . . adding that he actually shot Fields. He indicated that he fired shots into the chest of Fields, after which he passed the gun, a .357 caliber revolver to Cruz. Simultaneously, Raul using a .38 caliber revolver shot Turner." (Ex. 25C, p. 1.) The FBI report notes however, that the physical evidence shows that both parties were murdered by a .347 caliber weapon and they were both shot in the back. (Id.) The report states that, "Ruiz after being confronted with the above inconsistencies, began to provide still another story, but he was stopped by the interviewing agents and the interview concluded." (Id., p. 2.)
Ruiz's final interview with the FBI occurred on February 16, 1997. The FBI report of that interview states as follows:
 Ruiz stated that he had lied when he had been interviewed by the Federal Bureau of Investigation regarding the double homicide of Ricardo Turner and Lamont Fields, that occurred in late 1990. He specifically stated that the information he provided about former New Haven Police Department Detective Vincent Raucci and Connecticut States Attorney David Gold was completely false.
 Ruiz advised that he had been pressured to lie to the FBI by Scott Lewis, one of the subjects responsible for the murders. Ruiz confirmed that the testimony that he had given at the trials of Lewis and co-defendant, Stephan Morant, was the truth.
(Ex. 25D.)
As mentioned, the trial in the present case commenced in October 1998. Prior to the commencement of the trial, Ruiz indicated to a fellow inmate and certain correctional employees that his trial testimony had been false and that he was now going to tell the truth. When called to the stand in the present case, however, Ruiz took the Fifth Amendment.
When Ruiz's various statements to the FBI are viewed in light of all CT Page 7073 the evidence, his February 22, 1996 recantation is not credible. As has been seen, Ruiz himself subsequently disavowed the recantation in question, and he did not testify in the present case. Morant invites the Court to draw an adverse inference from Ruiz's invocation of the Fifth Amendment; see Olin Corp. v. Castells, 180 Conn. 49, 53, 428 A.2d 319
(1980); but no adverse inference can sensibly be drawn here. Against which side would Ruiz's hypothetical testimony be adverse? Ruiz has given so many contradictory statements in the past four years that a crystal ball would be required to predict the substance of the hypothetical testimony that he would have given in this case. The drawing of an adverse inference under these circumstances would be nothing more than speculation.
Of course, Ruiz did testify — under oath and subject to cross-examination — at Morant's criminal trial in 1994. This form of testimony has been preferred by the law for hundreds of years. There is nothing in Ruiz's February 22, 1996 recantation, much less in some hypothetical 1999 testimony that was never actually given, that significantly undermines his 1994 testimony. This is not just a matter of form. At the end of the day, Ruiz's 1994 testimony was credible because it was consistent with other credible evidence presented in the case, including the tape-recorded statement of Morant himself. Ruiz's February 22, 1996 recantation, on the other hand, is incredible because the factual allegations contained in that recantation — even when Ruiz is given every benefit of the doubt — simply cannot be squared with the ascertainable facts of the case. On the other hand, Ruiz's February 16, 1997 statement that he had been pressured to lie to the FBI and that his testimony at the criminal trials of Morant and Lewis was correct (Ex. 25D) is consistent with the evidence and has the ring of truth.
IX. OTHER EVIDENCE
The remaining evidence that Morant submitted at the hearing in the present case must now be reviewed. Two witnesses presented by Morant — Millie Martinez and Hector Ortiz — were wholly incredible. Martinez was sullen and argumentative by turn and was an entirely unconvincing witness. Ortiz, a sentenced prisoner with a lengthy record of felony convictions, gave the distinct impression of making up his testimony as he went along. These witnesses added nothing to the corpus of believable evidence in the case.
Jeffrey Rochler testified that he had been Lewis's employer at the time of the homicides. His testimony suggested that Lewis was working at the time that Turner and Fields were killed. Insofar as this testimony suggests that Lewis could not have been at the scene of the crime, it must be rejected as inconsistent with much credible evidence to the CT Page 7074 contrary. Rochler additionally testified that Raucci later interviewed him and that he told Raucci that Lewis could not have been involved. According to Rochler, Raucci told him, "Kid, if you know what's good for you, this conversation never happened." Rochler did not testify at Morant's criminal trial. Even if his testimony concerning Raucci's statement is correct, that testimony fails to establish that any evidence given at Morant's criminal trial was false.
Ray Boyd testified that he was a friend of Turner's and that he never saw Morant in Turner's apartment or in the company of either Turner or Fields. Assuming this testimony to be accurate, it hardly establishes the falsity of any evidence presented at Morant's criminal trial. As mentioned, Helen Gray testified in that trial that she had seen Morant and Fields together on three different occasions. (T. 522.) In addition, of course, there was other evidence — including Morant's own tape-recorded statement — that placed Morant at or near the scene of the crime at the time of the homicides.
The issue of Morant's tape-recorded statement must now be discussed. This was the subject of the supplemental evidentiary hearing held on April 11, 2000. Two witnesses testified at the supplemental hearing. Morant testified that the statement was false and given in a prompted manner under coercion from Raucci. In rebuttal, the State presented the testimony of Vaughn Maher, a retired New Haven police detective, who was present at the time the statement was given. Det. Maher testified that the statement was voluntary and not coerced. In terms of demeanor, Maher was credible, and Morant was not credible. In addition, Maher's testimony is corroborated by other credible evidence in the case, and Morant's is not.
Morant's testimony cannot be reconciled with either the tone or the substance of the tape-recorded statement in question. The tape was played for the Court during the course of the hearing and is a full exhibit in the case. In tone, Morant's descriptions of the critical facts — his presence in the car at the time of the homicides and Lewis's later disposition of the murder weapon — is quite animated. His tone is not that of someone who is reading from a script or being prodded to give wholly manufactured testimony. Rather, his tone is that of an eyewitness to a memorable event. The substance of Morant's statement is similarly inconsistent with that of a statement scripted by a police officer bent on framing a suspect. To give one of many examples, Morant specifically states that he does not believe that Lewis actually committed the homicides. (Ex. B, p. 8.) It is unlikely in the extreme that a police officer bent on framing a suspect would engineer a statement like the one in question here. Moreover, the text of the statement makes it clear that it is Morant who is doing the prompting rather than the police. For CT Page 7075 example, Morant takes pains to correct a police mistake concerning the location of the parked vehicle. (Id., p. 6.) For all these reasons, Morant's testimony that his statement was coerced and false is found not credible.
X. DISCUSSION
The standards for granting a new trial on a claim of false testimony (i.e. recantation) are discussed in part II, supra. The discussion will be guided by the three-pronged test articulated in that part, viz.: (1) the court must be reasonably well satisfied that the testimony of a material witness is false; (2) the availability of the newly discovered information would have led to a different result; and (3) the party seeking the new trial was taken by surprise when the false testimony was given. These prongs will be considered in turn in light of the factual findings already discussed.
A. Was the testimony of a material witness false?
A court hearing a petition for new trial must first determine whether it "is reasonably well satisfied that the testimony of a material witness is false." Channer v. State, supra, 54 Conn. App. at 627. Morant's Fifth Amended Petition claims that two witnesses gave false testimony at his criminal trial: Ruiz and Raucci. Ruiz's testimony placing Morant at the scene of the crime is alleged to be false. The same claim is made concerning Raucci's testimony that Ruiz's statements of January 14, 1991, and May 28, 1991 were voluntary.
Ruiz and Raucci are not of equal importance for purposes of this analysis. Ruiz's testimony was eyewitness testimony placing Morant at the scene of the crime. Raucci's testimony, important as it was, merely served to corroborate Ruiz. If one accepts the hypothesis that Ruiz's testimony was true, it would be inappropriate to grant Morant a new trial even if one also accepts the hypothesis that Raucci's testimony was false. "Where claimed newly discovered evidence would merely affect the credibility of a witness, it is not a ground for a new trial unless it is reasonably probable that on a new trial there would be a different result." Lancaster v. Bank of New York, 147 Conn. 566, 578, 164 A.2d 392
(1960). If Ruiz's testimony was true, the result of a new trial would (and should) be the same, regardless of Raucci's credibility. If, on the other hand, Ruiz's was false, Morant has been the victim of the grossest injustice and should be given a new trial even if Raucci's testimony was true in every detail. Consequently, the truth of Ruiz's testimony is necessarily the focal point of judicial inquiry in this case.
The judicial task in this case is to determine whether Ruiz, in giving CT Page 7076 his recantation, was a conscience-driven penitent or a criminal bent on defeating the ends of justice. People v. Shilitano, 112 N.E. 733, 739
(N.Y. 1916) (Cardozo, J. concurring). "Recantation as grounds for a new trial has always been viewed with skepticism." Johnson v.State, supra, 36 Conn. App. at 69. This is especially the case when the recanter does not testify in court. Pradlik v. State,supra, 131 Conn. at 685. The fact that Ruiz appeared in court but invoked the Fifth Amendment is no help to Morant. The courts have routinely denied petitions for new trial in just this situation.See United States v. Lawrenson, 315 F.2d 612, 613 (4th Cir.), cert. denied, 373 U.S. 938 (1963); Newman v. United States,238 F.2d 861, 862 (5th Cir. 1956); Dunbar v. State, 555 P.2d 548, 550
(Alaska 1976); 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 557.1 at 348 (2d ed. 1982). The fact that Ruiz made his recantations while incarcerated cannot be overlooked. Recantations obtained in such circumstances are especially unlikely to be reliable.See Smith v. State, 139 Conn. 249, 252-53, 93 A.2d 296 (1952).
It is true that Ruiz gave his recantation to the FBI. Morant understandably places great emphasis on what he considers to be the trustworthy circumstances of that recantation. Under the circumstances of this case, however, the fact that Ruiz gave his recantation to the FBI gives his recantation no added credibility whatsoever. The evidence incontrovertibly establishes that Ruiz later gave a second story to the FBI that was completely at odds with his first, and that, in his third
interview, he completely recanted his initial recantation. Each of these statements was given to the FBI, and it is completely obvious that not all of them can be true. Under these circumstances, the fact that Ruiz's statements were made to the FBI is entitled to no evidentiary weight whatsoever.
Of course the fact that Ruiz has given so many different stories inevitably raises its own flag of suspicion, but suspicion is not the standard for the granting of a new trial. It is not unusual for witnesses in criminal trials — especially incarcerated witnesses — to tell a number of different stories following a verdict of guilty. The law wisely recognizes that a jury's considered verdict should not be set aside because of this phenomenon. If the law were otherwise, verdicts in criminal cases would be fragile indeed.
The testimony of Michael Sweeney does not alter this analysis. Sweeney's testimony — like Ruiz's recantation — raises a flag of suspicion with respect to the accuracy of the trial testimony of Raucci and Ruiz. Suspicion, however, is not proof. As discussed above, Sweeney did not testify that Raucci gave Ruiz the names of Morant and Lewis. Even in his February 22, 1996 recantation, Ruiz admitted that CT Page 7077 "most of his story is true." The only claimed falsehood is the substitution of Morant and Lewis for the actual killers. Sweeney's testimony does not establish that Ruiz's testimony was false in any way on this critical point. While Sweeney's testimony raises the possibility that Raucci may have given Ruiz some other facts — like the location and color of the house and the color of the car in question — those facts are unimportant and not even in dispute.
For these reasons, I find that Ruiz's February 22, 1996 recantation was not credible. After a careful consideration of all of the evidence presented, I conclude that Morant has failed to satisfy his burden of proving that the testimony of a material witness was false.
B. Would the availability of the newly discovered evidence have led to adifferent result?
Although Morant's failure to satisfy the first prong of the controlling test is fatal to his cause, it is appropriate briefly to address the test's second prong. Would the availability of the newly discovered evidence have led to a different result? After a careful consideration of all the evidence, I conclude that the answer to this question is No.
"It is not sufficient for [a petitioner] to bring in new evidence from which a jury could find him not guilty — it must be evidence which persuades the judge that a jury would find him not guilty." Lombardo v.State, 172 Conn. 385, 391, 374 A.2d 1065 (1977). For reasons already discussed, the evidence presented in this case is not of the requisite caliber. It must be remembered that the testimony of Raucci and Ruiz was not the only evidence implicating Morant. Morant was additionally implicated by the statement of Jose Roque that Morant told Lewis "you did what you had to do"; by the testimony of Helen Gray that she had seen Morant in the company of Fields on three different occasions; by the testimony of Diane Basilicato that she had heard a banging and two people running down the apartment building's stairs; and, most of all, by Morant's own tape-recorded statement placing him at the scene. That statement was wholly inconsistent with both Morant's subsequently produced alibi evidence and Ruiz's February 22, 1996 recantation. Morant's testimony in this case concerning his tape-recorded statement was not credible.
For these reasons, after a thorough consideration of the voluminous evidence presented, I find that the availability of the newly discovered evidence would not have led to a different result.
Because Morant has failed to establish either the first or second prongs of the controlling test, the third (surprise) prong of the CT Page 7078 controlling test need not be discussed. See Channer v. State, supra,54 Conn. App. at 630-32.
X. CONCLUSION
The Fifth Amended Petition For New Trial (as to Count One only) is denied.
Jon C. Blue Judge of the Superior Court